STATE OF NORTH CAROLINA v. MELVIN LEE WHITE, JR.

No. 505A96

(Filed 31 December 1998)

## 1. Constitutional Law § 344.1 (NCI4th)— capital trial— unrecorded bench conferences—defendant present in courtroom

There was no error in a capital prosecution for first-degree murder where the court conducted fourteen unrecorded bench conferences with defense counsel and the prosecution to which defendant was not privy, even though he was present in the courtroom. It is the presence of defendant's counsel at a bench conference which insures that the subject matter of the conference is not concealed from defendant. Although defendant contended that it must be assumed that he was unable to hear the dialogue and that his right to presence was violated because the court reporter could not hear a portion of the discussion of a request for referral with a prospective juror, the transcript indicates that defendant and his counsel were present and defendant has made no showing that they were not able to hear the prospective juror.

## 2. Jury § 248 (NCI4th)— peremptory challenges—racial bias—procedure

A three-step procedure has been frequently reiterated for use when a defendant objects to a prosecutor's use of peremptory challenges on the basis of racial discrimination. Defendant must first make a *prima facie* case that the prosecutors exercised a peremptory challenge on the basis of race; once the *prima facie* case has been established by defendant, the burden shifts to the State, which must offer a race-neutral explanation for attempting to strike the juror in question; and the court must make the ultimate determination of whether defendant has established purposeful discrimination.

## 3. Jury § 260 (NCI4th)— jury selection—peremptory challenges—racial discrimination—racially neutral reasons for challenge

The trial court's determination in a capital prosecution for first-degree murder that there was no purposeful racial discrimination in two peremptory challenges was not clearly erro-

neous where the prosecutor provided certain reasons for the strikes.

**4. Jury § 260 (NCI4th)— jury selection—peremptory challenges—racial discrimination—prosecutor's reasons**

The trial court's conclusion in a capital prosecution for first-degree murder that there was no purposeful racial discrimination in the strike of a prospective juror was not clearly erroneous where defendant argued that the rationales articulated by the prosecution were clearly pretext since the prosecutor never asked the prospective juror whether she could be fair and impartial in deciding the case. The prosecutor's explanations for the strike are supported in the record and the prosecutor was not required to ask the prospective juror whether she could be impartial even though she had friends who went to school with defendant; as long as the motive is not racial discrimination, a prosecutor may exercise peremptory challenges based on legitimate hunches and past experience. Moreover, defendant offered no rebuttal.

**5. Evidence and Witnesses §§ 318, 351 (NCI4th)— first-degree murder—prior violence toward girlfriend—admissibility to show motive**

There was no error in a capital prosecution for first-degree murder in the admission of evidence of defendant's acts and threats of violence toward his girlfriend. The State presented evidence that defendant was determined to control his girlfriend to the point of assaulting her, kidnapping her at gunpoint, tying her to his bed, and threatening to kill her or her family if she tried to leave him. This evidence supported the State's theory that defendant killed the victims, his girlfriend's grandparents, in retaliation against the girlfriend for resisting his control, for seeking the protection of her mother, and for telling defendant in her mother's presence that she did not want to be with him. This evidence was admissible under N.C.G.S. § 8C-1, Rule 404(b) to show defendant's motive and to identify defendant as the person who committed the murders.

**6. Evidence and Witnesses §§ 351, 318 (NCI4th)— first-degree murder—prior acts of violence—admissible**

The trial court did not abuse its discretion in a prosecution for first-degree murder by allowing evidence that eleven months prior to the murders, defendant took his girfriend by force away

from a cookout and fired a shotgun when members of her family came to check on her safety. The evidence was admissible to show identity and motive, namely, retaliation for the girlfriend's resistance to defendant's forceful control.

**7. Evidence and Witnesses §§ 351, 318 (NCI4th)— first-degree murder—prior acts of violence—admissible**

The trial court did not err in a capital prosecution for first-degree murder by admitting evidence that, two years before these murders, defendant had gone to the house of Georgia Green and Cleveland Wilson (the victims) with a shotgun, pointed it at Cleveland Wilson, and threatened to kill him. Defendant's earlier threat to kill Cleveland Wilson is relevant to show the ill will between them, the evidence is probative of defendant's motive and identity, and the two-year span between the threat and the murders does not render the threat too remote to show motive and identity.

**8. Evidence and Witnesses § 1484 (NCI4th)— first-degree murder—shell casings—found in Arizona—admissible**

The trial court did not err in a capital first-degree murder prosecution by admitting into evidence shell casings found in Arizona where Arizona police, responding to a report of shots being fired in a certain area, found several freshly fired nine millimeter shell casings; this site was not far from the motel where defendant was staying; tests showed that the casings were fired from the same gun which fired the empty casings found beside the two murder victims in North Carolina and empty shell casings found outside defendant's residence in North Carolina; and the murder weapon was never located, but defendant had purchased a nine-millimeter handgun shortly before the murders. The relevance of the Arizona casings and their link to defendant and the murders is manifest and, as for the chain of custody, no gap existed which may have rendered the casings irrelevant.

**9. Evidence and Witnesses § 2896 (NCI4th)— first-degree murder—cross-examination of defendant—charges without convictions**

The trial court did not err in a capital prosecution for first-degree murder by allowing the prosecutor to cross-examine defendant about offenses for which he was charged but not convicted. The prosecutor properly asked defendant about his prior convictions, defendant denied knowing anything about the spe-

cific offenses, and the questioning related to factual elements of the crimes and to necessary detail designed to jog defendant's memory.

### 10. Evidence and Witnesses § 2815 (NCI4th)— leading questions—nervous witness

The trial court did not abuse its discretion in a capital prosecution for first-degree murder by allowing the State to ask leading questions of a witness who was a very nervous and very quiet person. The trial court recognized the limitations of the witness under the circumstances and allowed a mode of questioning which was necessary to develop the testimony.

### 11. Evidence and Witnesses § 2815 (NCI4th)— leading questions—direction of witness's attention

The trial court did not abuse its discretion in a capital prosecution for first-degree murder by allowing the prosecutor to ask an officer a leading question where an assault had occurred at one location and the murder at another, and the prosecutor was attempting to turn the witness's attention from the details of the assault to what he had heard at that location about another matter.

### 12. Criminal Law § 473 (NCI4th Rev.)— first-degree murder—prosecutor's closing argument—defense counsel

There was no plain error in a capital prosecution for first-degree murder where defendant contended that the prosecutor impugned the integrity of counsel for the defense but the prosecutor did not use abusive, vituperative, or opprobrious language and did not impugn the integrity of defense counsel or repeatedly attempt to diminish defense counsel before the jury. Reviewing the argument in context, the prosecutor was merely responding to defense counsel's arguments.

### 13. Criminal Law § 358 (NCI4th Rev.)— first-degree murder—defendant shackled during sentencing

The trial court did not abuse its discretion during a capital sentencing proceeding by ordering that defendant be shackled during the proceeding. The decision was a rational exercise of the court's discretion and was reasonably necessary to maintain order or provide for the safety of persons. Defendant cites no law for the argument that the trial court has a duty to explore lesser means of restraint before shackling a defendant; moreover, in

this case the court both considered and employed lesser alternatives prior to shackling defendant.

**14. Constitutional Law § 284 (NCI4th)— capital sentencing proceeding—defendant's request to release counsel**

The trial court did not err in a capital sentencing proceeding by denying defendant's request that his counsel be released. Defendant did not request to represent himself and, from the record, it appears that he was understandably depressed about the guilty verdicts and was not fully aware of the sentencing proceeding's very real consequences, nor was he fully aware of the nature of the sentencing proceeding. He had to be informed by the trial court that he was wrong in his initial impression that there was nothing more that his counsel could do and that it was very important that he retain counsel for the sentencing proceeding.

**15. Constitutional Law § 314 (NCI4th)— capital sentencing— strategy—defendant's wishes**

The trial court did not err in a capital sentencing proceeding where defense counsel was about to offer evidence concerning the history of domestic violence and abuse in defendant's family while defendant was growing up, defendant made it clear that he did not want any evidence about his family brought out, and the court ruled that it would not allow questions about domestic violence in defendant's home as he was growing up. Defense counsel were not prohibited from presenting all mitigating evidence, they examined nine witnesses on the circumstances of defendant's life and various aspects of his character and submitted to the jury two statutory mitigating circumstances, seven nonstatutory mitigating circumstances and the catchall circumstance. As the colloquy between the court and defendant reveals, an impasse existed between defendant and his counsel over whether the evidence in question would tend to mitigate defendant's sentence or aggravate it. When counsel and a fully informed criminal defendant reach an absolute impasse as to tactical decisions such as the type of defense to present and witnesses to call, the client's wishes must control. While the trial court denied a full offer of proof, it allowed defense counsel to articulate what defendant's showing would have been and, since the court did not err in precluding the evidence, the denial of the offer of proof was not prejudicial.

**16. Criminal Law § 692 (NCI4th Rev.)— capital sentencing— mitigating circumstance—influence of mental or emotional disturbance—peremptory instruction denied**

The trial court did not err in a capital sentencing proceeding by refusing to give a peremptory instruction on the statutory mitigating circumstance that the murders were committed while defendant was under the influence of a mental or emotional disturbance. Although defendant contends that a statement by the trial court indicated that the court based its denial on the mistaken belief that it was without authority to grant the peremptory instruction, the statement read in context was merely recognition that the evidence in this case was conflicting.

**17. Criminal Law § 690 (NCI4th Rev.)— capital sentencing— nonstatutory mitigating circumstances—peremptory instructions**

There was no error in a capital sentencing proceeding where defendant contended that the court erred by failing to give peremptory instructions on nonstatutory mitigating circumstances despite having agreed to give such instructions during the charge conference. The trial court was correct not to utilize the pattern instructions suggested by defense counsel because peremptory instructions which are appropriate for statutory mitigating circumstances are inappropriate for nonstatutory mitigating circumstances. Furthermore, it is not error for a trial court in a capital case to refuse to give requested instructions where counsel failed to submit the instructions in writing. Finally, counsel did not object when given the opportunity either at the charge conference or after the charge had been given.

**18. Criminal Law § 1375 (NCI4th Rev.)— capital sentencing— instructions—consideration of mitigating circumstances— "may" rather than must**

The trial court did not err in a capital sentencing proceeding in its instructions on Issues Three and Four by using the word "may" rather than "must."

**19. Criminal Law § 1402 (NCI4th Rev.)— capital sentencing— death sentence not disproportionate**

A sentence of death for first-degree murder was not imposed under the influence of passion, prejudice, or other arbitrary considerations and the jury's findings of the two aggravating circumstances were supported by the evidence.

**20. Criminal Law § 1402 (NCI4th Rev.)— death sentence—not disproportionate**

A sentence of death for two first-degree murders was not disproportionate where defendant was found guilty of the premeditated and deliberate murders of two unsuspecting, defenseless victims in their own home in retaliation for his girlfriend leaving him.

Appeal as of right pursuant to N.C.G.S. § 7A-27(a) from a judgment imposing a sentence of death entered by Wainwright, J., on 15 October 1996 in Superior Court, Craven County, upon jury verdicts finding defendant guilty of two counts of first-degree murder. Defendant's motion to bypass the Court of Appeals as to his appeal of an additional judgment for first-degree burglary was allowed by the Supreme Court on 20 May 1998. Heard in the Supreme Court 12 October 1998.

*Michael F. Easley, Attorney General, by Ellen B. Scouten, Special Deputy Attorney General, for the State.*

*Marshall Dayan for defendant-appellant.*

PARKER, Justice.

Defendant was indicted on 18 July 1995 for two counts of first-degree murder and on 18 September 1995 for one count of first-degree burglary. Defendant was tried capitally in September of 1996 and found guilty of both counts of first-degree murder and of first-degree burglary. Following a capital-sentencing proceeding, the jury recommended a sentence of death for each of the murders; after consolidating the judgments, the trial court entered judgment accordingly. For the first-degree burglary conviction, the trial court sentenced defendant to a concurrent term of imprisonment for 82 to 108 months. For the reasons discussed herein, we conclude that the jury selection, the guilt-innocence phase, and the capital-sentencing proceeding of defendant's trial were free from prejudicial error and that the death sentence is not disproportionate.

The State's evidence at trial tended to show that defendant killed victims Georgia Green and Cleveland Wilson in order to retaliate against his girlfriend, Patricia Green, the granddaughter of victim Georgia Green, for not wanting to be with him anymore and for resisting his attempt to take her to Mexico by force and against her will.

Defendant met Patricia Green when he was twenty-three years old and she was fourteen; at the time of the crimes, defendant was twenty-nine, and Patricia was nineteen. Patricia lived with her grandmother, Georgia Green, who had raised Patricia since age four and who was very much like a mother to her. Two years after defendant and Patricia met, they lived together in the house of victim Georgia Green. Later they moved out to their own home. Defendant began to abuse Patricia and became increasingly possessive of her and violent towards her. He would beat her, hitting her on her face, arms, and legs; but she never went to the doctor because she was too ashamed. On one occasion, 4 July 1994, when Patricia went to a cookout with some friends, defendant arrived and ordered her away with such threats and force that she had her mother, Ella Green, call the police. When Ella Green and other family members went to defendant's and Patricia's mobile home, defendant came outside and fired two shotgun blasts before the police arrived.

Defendant continued to assault Patricia, two or three times per month. On occasion she would report the assaults to law enforcement; but when the case came to court, she would not testify against defendant. Defendant told her frequently that if she ever tried to leave him, he would kill her or kill her family members to make her hurt. Defendant knew that Patricia was very close to her grandmother, Georgia Green.

In late April 1995, after she received a beating for threatening to leave him, Patricia left defendant and went to live with a girlfriend. Defendant waited for her outside her place of work and ran her off the road with his car. He forced her into his car and took her back to his house, where he beat her and tied her to the bed with duct tape and rope. Defendant kept her tied up for two days. After untying her, he kept her in the house, which he was able to lock from the outside.

Shortly after this incident, and because of her fear of defendant and his threats to kill her, Patricia went to Florida in May of 1995 and found work there. After about a month she telephoned defendant and told him that she wanted him to stop controlling her and hitting her and that she wanted a friendship with him but not a relationship. The next day defendant appeared in Florida at Patricia's place of work; he got her to come outside, saying he wanted to talk. He then pointed a nine-millimeter handgun at her and forced her to get into the car. Defendant drove her back through the night to North Carolina, telling her that if she screamed he would shoot her. He told her that he loved

her but that if he could not have her, no one would have her and that he would kill her. He took her to his house and again tied her to the bed with duct tape and rope. He later took her with him while he pawned and sold some items, and then he took her to the Sheriff's Department because someone had reported that defendant had kidnapped her. Patricia told the Sheriff's Department, out of fear for her life, that defendant had not kidnapped her.

On 8 June 1995, defendant told Patricia that he wanted her to go to Mexico with him. Because of his threats, and feeling that her mother was her last chance to get away from defendant, she agreed to go if he would take her to see her grandmother and mother before leaving. Defendant stopped pointing the gun at Patricia and told her that he wanted her to trust him. When they got to the house of Patricia's grandmother, Georgia Green, defendant took the gun upstairs and hid it. They then left Georgia Green's house and drove to Patricia's mother's mobile home. While driving there defendant repeatedly told Patricia, "If you try anything . . . I'll kill you. I'll kill all of you all."

Patricia Green's mother, Ella Green, talked with defendant and her daughter to try to calm or solve the situation. Patricia told her mother that she did not want to be with defendant and that she wanted defendant to leave her alone. Defendant then tried to push Patricia into his car; but Ella Green grabbed Patricia and, standing between her daughter and defendant, told defendant to leave. Defendant got into his car and drove it forward into Ella Green, injuring her legs and damaging her house. He then drove off toward Georgia Green's house.

Patricia telephoned the police and called for an ambulance for her mother; she then called her uncle, Jake Howard, and asked him to check on Georgia Green. Mr. Howard had known defendant and his family for some time. When Mr. Howard arrived at Georgia Green's house, he saw defendant coming from the far corner of the house with a gun in his hand. Mr. Howard asked defendant what was the matter; and defendant said, "She's been treating me nice, just like a honey rose all day, until we got to her mother's house. And then they tried to jam me up, and I run over Ella." Mr. Howard then left, without checking on Georgia Green, to see what had happened to Ella Green.

Deputy Sheriff Marvin Haddock spoke with Mr. Howard and went with Patricia Green and other family members to Georgia Green's

house to apprehend defendant. An upstairs window had been raised, and no one responded to their knocking. All the doors were locked; and after Deputy Haddock called for backup, the officers broke into the house. They found Georgia Green's body facedown on the floor in front of a lounge chair; she had been shot two times in the head. They also found the body of Cleveland Wilson on the couch, shot once through the face and neck and twice through the temple into the head. They found six shell casings near the bodies. Shoe tracks on the tin roof of the front porch led to, and away from, the open upstairs window. Patricia Green told the officers that defendant had threatened to kill her family if she left him. Officers then searched defendant's mobile home and found rope tied to the bedpost, and tape, with hair stuck to it, on the bedpost and floor. On the ground outside the mobile home, officers found an empty nine-millimeter shell box and shell casings.

Defendant left the state and was found in Tucson, Arizona three months later, on 11 September 1995, by a police officer who saw him walking on the highway. Defendant walked up to the car and told the officer, "I'm the one you're looking for," and that he was wanted for murder. The officer found there were outstanding warrants for defendant in North Carolina charging him with two counts of first-degree murder. Officers searched defendant's car and Arizona motel room and found a black handgun holster.

Arizona officers also sent to North Carolina nine spent nine-millimeter shell casings which they had found on 5 September 1995 after a report of shots being fired near a convenience store within a mile and a half of defendant's motel room. An examination of three of the shell casings found at defendant's residence in North Carolina revealed they were fired from the same gun which fired the casings found at the murder scene and the casings found in Arizona, to the exclusion of all other guns. A week or two before the murders, defendant had purchased a nine-millimeter automatic pistol for $350.00 from someone he worked with on his job site.

Defendant testified on his own behalf; he denied committing any act of violence or assault upon or kidnapping of Patricia Green and denied committing the murders of Georgia Green and Cleveland Wilson. Defendant admitted buying a nine-millimeter pistol at his job site. Defendant and another witness testified that when defendant and Patricia visited Georgia Green the day before the murders, defendant had given the handgun to Patricia, who hid it upstairs.

Defendant admitted hitting Ella Green with his car, but denied ever threatening to kill Patricia or anyone in her family.

During the sentencing proceeding the State introduced into evidence documents showing defendant's March 1990 conviction for felonious breaking and entering. Also, Beverly Brown testified that she dated defendant and that he was the father of her child. She testified that defendant became possessive of her and on one occasion fired a shot from a gun to make friends of hers leave. She left him and returned to live with her mother; but in October of 1989 defendant went to her house, kicked the door in, snatched their one-year-old baby, and fired a shotgun blast into the bedroom where Ms. Brown was with other family members. Ms. Brown had to lie and promise that she would move back in with defendant to get him to return the baby.

Defendant presented as witnesses at sentencing several members of his family and friends who testified that he had a good reputation in the community. A former instructor and employer testified that defendant was a good worker, with good work habits; that he listened well and had a positive attitude; and that he was a fast learner. Others knew him as a hard worker who worked full-time as a brick mason and who also worked part-time jobs; some testified that he and Patricia acted happy when they were together and that defendant cared about her. A former teacher of defendant's testified that he did well in math and vocational studies; she also testified that defendant had been in a special class for students classified as learning-disabled in English and that he had tried very hard to improve.

## JURY SELECTION

[1] Defendant first argues that his right under Article I, Section 23 of the North Carolina Constitution to be present at all stages of his capital trial was violated when the trial court conducted with defense counsel and the prosecution fourteen unrecorded bench conferences to which defendant himself was not privy, even though he was present in the courtroom. We have discussed this issue recently, and at some length. *See State v. Bonnett,* 348 N.C. 417, 432, 502 S.E.2d 563, 574 (1998); *State v. Speller,* 345 N.C. 600, 604-05, 481 S.E.2d 284, 286-87 (1997); *State v. Buchanan,* 330 N.C. 202, 208-24, 410 S.E.2d 832, 835-45 (1991). A defendant's state constitutional right "to be present at all stages of his capital trial is not violated when, with defendant present in the courtroom, the trial court conducts bench conferences, even though unrecorded, with counsel for both parties."

*Buchanan,* 330 N.C. at 223, 410 S.E.2d at 845. In this case, the record does not show, and defendant does not contend, that he was absent from the courtroom during any of the conferences in question. Moreover, the record shows that defense counsel was present at and took part in each of the fourteen bench conferences. During deliberations, the trial court placed the following in the record:

> THE COURT: Let me say something else on the record. Since the trial has been completed, I believe it is correct to say that all bench conferences in this trial were done in the presence of the district attorney and defense counsel; is that correct? Everybody agrees with that?
>
> [DEFENSE COUNSEL]: That's correct.
>
> [OTHER DEFENSE COUNSEL]: Yes, sir.
>
> [PROSECUTOR]: Yes. The defendant was present in the courtroom during all of this.
>
> THE COURT: That's correct. That each bench conference, both counsel for defendant were present and protecting the rights of the defendant.

It is the presence of defendant's counsel at a bench conference which ensures that the subject matter of the conference is not concealed from defendant. As we have said in such cases, defendant was "in a position to observe the context of the conferences and to inquire of his attorneys as to the nature and substance of each one" such that he could have taken appropriate exception. *Speller,* 345 N.C. at 605, 481 S.E.2d at 286. Defendant, "[t]hrough his attorneys[,] . . . had constructive knowledge of all that transpired." *Buchanan,* 330 N.C. at 223, 410 S.E.2d at 844.

Defendant nevertheless asserts that the conferences held in his case during jury selection make his case virtually indistinguishable from *State v. Boyd,* 332 N.C. 101, 418 S.E.2d 471 (1992); *State v. Monroe,* 330 N.C. 846, 412 S.E.2d 652 (1992); *State v. McCarver,* 329 N.C. 259, 404 S.E.2d 821 (1991); and *State v. Smith,* 326 N.C. 792, 392 S.E.2d 362 (1990), in each of which cases we granted a new trial for violation of Article I, Section 23 when the trial court held unrecorded conferences with prospective jurors at the bench. However, in each of those cases, the trial court conferred with prospective jurors alone without defendant's counsel present at the bench. *Boyd,* 332 N.C. at 104, 418 S.E.2d at 473; *Monroe,* 330 N.C. at 848, 412 S.E.2d at 653;

*McCarver*, 329 N.C. at 260, 404 S.E.2d at 821; *Smith*, 326 N.C. at 793-94, 392 S.E.2d at 363. Defendant's reliance on *State v. Exum*, 343 N.C. 291, 293-96, 470 S.E.2d 333, 334-36 (1996), with respect to those conferences held during the guilt-innocence and penalty phases of his trial is misplaced. In *Exum* the trial court held an unrecorded conference not in open court where defendant could observe the context of the conference, as here, but in judge's chambers with the defendant's attorneys alone. *Id. Exum*, therefore, is distinguishable on its facts from this case.

Defendant also includes in this assignment of error one instance in which the trial court was discussing a request for deferral with a prospective juror, and the court reporter could not hear or record a portion of their colloquy. Defendant maintains that since the reporter was unable to hear the dialogue, we must assume that defendant was likewise unable to hear the dialogue and that defendant's right to presence was thus violated since he was "constructively absent" from the proceedings. The transcript, however, indicates that defendant and his counsel were present during this proceeding; and defendant has made no showing that they were not able to hear the prospective juror. The juror-deferral process in this case was conducted in open court, unlike the process we held unconstitutional in *McCarver* and *Smith*, where the trial court heard each juror's request for deferment privately at the bench, excluding even trial counsel from the conference. *McCarver*, 329 N.C. at 260, 404 S.E.2d at 821; *Smith*, 326 N.C. at 793, 392 S.E.2d at 363. This assignment of error is overruled.

[2] Defendant next assigns error to the trial court's failure to find that the prosecution used peremptory challenges to strike for purposefully racially discriminatory reasons two African-American prospective jurors, Andronica Crouell and Sherry Edgeston, in violation of *Batson v. Kentucky*, 476 U.S. 79, 90 L. Ed. 2d 69 (1986). Article I, Section 26 of the Constitution of North Carolina forbids the use of peremptory challenges for a racially discriminatory purpose, *State v. Williams*, 339 N.C. 1, 15, 452 S.E.2d 245, 254 (1994), *cert. denied*, 516 U.S. 833, 133 L. Ed. 2d 61 (1995), as does the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution, *Batson*, 476 U.S. at 86, 90 L. Ed. 2d at 80. This Court has frequently reiterated the three-step procedure to be utilized by a trial court when a defendant objects on the basis of racial discrimination to a prosecutor's use of peremptory challenges to remove prospective jurors. *See, e.g., State v. Cummings*, 346 N.C. 291, 307-08, 488 S.E.2d 550, 560 (1997), *cert. denied*, —— U.S. ——, 139 L. Ed. 2d 873 (1998).

First, a defendant must make out a *prima facie* case that the prosecutor has exercised a peremptory challenge on the basis of race. *Hernandez v. New York*, 500 U.S. 352, 358, 114 L. Ed. 2d 395, 405 (1991). The defendant may make this showing based on all relevant circumstances, such as defendant's race, the victim's race, the race of key witnesses, questions and statements of the prosecutor which tend to support or refute an inference of discrimination, a pattern of strikes against minorities, or the State's acceptance rate of prospective minority jurors. *State v. Hoffman*, 348 N.C. 548, 550, 500 S.E.2d 718, 720 (1998).

Second, once the *prima facie* case has been established by defendant, the burden shifts to the State, which, in order to rebut the inference of discrimination, must offer a race-neutral explanation for attempting to strike the juror in question. *Hernandez v. New York*, 500 U.S. at 358-59, 114 L. Ed. 2d at 405. In cases in which the trial court explicitly rules that defendant failed to make out a *prima facie* case of racial discrimination, our review is limited to whether this finding by the trial court was error. *State v. Fletcher*, 348 N.C. 292, 320, 500 S.E.2d 668, 684 (1998). However, in cases in which the trial court does not explicitly rule on the *prima facie* case and where the prosecution proceeds to step two of *Batson* by articulating its explanations for the strike, the question of whether a *prima facie* case has been established becomes moot. *State v. Williams*, 343 N.C. 345, 359, 471 S.E.2d 379, 386-87 (1996), *cert. denied*, —— U.S. ——, 136 L. Ed. 2d 618 (1997); *State v. Lyons*, 343 N.C. 1, 11-12, 468 S.E.2d 204, 208, *cert. denied*, —— U.S. ——, 136 L. Ed. 2d 167 (1996). Also, as part of the second *Batson* step, defendant is entitled to surrebuttal to show that the prosecution's explanations for the strike are merely a pretext. *State v. Gaines*, 345 N.C. 647, 668, 483 S.E.2d 396, 408, *cert. denied*, —— U.S. ——, 139 L. Ed. 2d 177 (1997); *State v. Robinson*, 330 N.C. 1, 16, 409 S.E.2d 288, 296 (1991).

Third, the trial court must make the ultimate determination of whether defendant has established purposeful discrimination. *Hernandez v. New York*, 500 U.S. at 359, 114 L. Ed. 2d at 405. An "examination of the actual explanations given by the district attorney for challenging [minority] veniremen is a crucial part of testing defendant's *Batson* claim." *State v. Smith*, 328 N.C. 99, 125, 400 S.E.2d 712, 726 (1991). Other factors to which this Court has looked to determine the presence or absence of intentional discrimination include the susceptibility of the particular case to racial discrimination, whether the State used all of its peremptory challenges, the race

STATE v. WHITE

[349 N.C. 535 (1998)]

of witnesses in the case, questions and statements by the prosecutor during jury selection which tend to support or refute an inference of discrimination, and whether the State has accepted any African-American jurors. *State v. Kandies*, 342 N.C. 419, 435, 467 S.E.2d 67, 75, *cert. denied*, —— U.S. ——, 136 L. Ed. 2d 167 (1996). Since the trial court's findings as to purposeful discrimination depend in large measure on its evaluation of credibility, they are given great deference; and the trial court's determination will be upheld unless the appellate court is convinced that the trial court's decision is clearly erroneous. *Fletcher*, 348 N.C. at 313, 500 S.E.2d at 680.

[3] In this case, after the prosecutor peremptorily excused prospective juror Crouell, a black female, defendant raised a *Batson* objection and provided appropriate grounds to state a *prima facie* case of discrimination. The trial court declined to rule on whether the *prima facie* case had been met, but gave the prosecutor the opportunity to state his race-neutral reasons for the strike. Thus, the question of whether the *prima facie* case had been established is moot, and we proceed as if the *prima facie* case had been established. *Williams*, 343 N.C. at 359, 471 S.E.2d at 386-87. The prosecutor then provided reasons for striking Ms. Crouell: that she was twenty years old, unmarried, with a four-week-old child, and did not list on her jury questionnaire a father of the child, or any husband or former spouse; that while she had indicated that she had never been involved in any boyfriend-girlfriend problem, her manifest status as a young, unwed mother who did not list the father of her child throws doubt upon that response; that she was a member of the Pentecostal Holiness Church, which, in the prosecutor's recollection from jury selection in other capital trials, is opposed to the death penalty; that she sat with her arms crossed and was somewhat unresponsive for a period of time during questioning; and that her youth and four-week-old child might have prevented her from being a suitable juror in any trial, much less a lengthy capital trial. Defendant did not offer any surrebuttal of the prosecutor's stated reasons for the strike, appearing to rely on the arguments stated in his *prima facie* case. Finally, the trial court made its determination that there was no purposeful discrimination in the strike of prospective juror Crouell.

Defendant argues that the prosecutor's stated explanations for the strike of Ms. Crouell, even though they were facially race-neutral, were not "related to the particular case to be tried," citing *State v. Robinson*, 346 N.C. 586, 597, 488 S.E.2d 174, 181 (1997). In explanation, defendant argues that some of Ms. Crouell's answers on *voir*

*dire* favored the prosecution's retaining her as a juror rather than excusing her: she had some college education, she had a relative who worked as a dispatcher for the Jones County Sheriff's Department, and she responded that she could vote for the death penalty under certain circumstances. After reviewing the transcript we conclude that the prosecutor's stated reasons for the strike are supported in the record and are related to the answers elicited from the prospective juror on *voir dire*. We note, too, that this case is one that is not particularly susceptible to racial discrimination, as defendant, the victims, chief witness Patricia Green, and other witnesses are all African-American. *Kandies*, 342 N.C. at 435, 467 S.E.2d at 75. We also note that at the time of this challenge, the prosecutor had accepted one African-American from the venire. We conclude that the trial court's determination that there was no purposeful discrimination in this strike is not clearly erroneous. *Fletcher*, 348 N.C. at 313, 500 S.E.2d at 680.

[4] The prosecutor also peremptorily excused another young black female juror, Sherry Edgeston; defendant objected and stated appropriate grounds for a *prima facie* case. The trial court again explicitly declined to make a ruling on the existence of a *prima facie* case, but gave the prosecution the opportunity to state its reasons for the strike. The prosecutor stated as his reasons that the prospective juror had heard about the murders when they first occurred; that the murders had occurred about ten miles from where the prospective juror lived; that when the prospective juror saw defendant's picture on television, she was with a group of friends who had gone to school with defendant and that they asked her if she had gone to school with him as well; that the prospective juror had gone to school with some people with the last name of Green from the Vanceboro area; and that, in the prosecutor's belief, most of the Greens from that area are related, which might have posed a risk of this prospective juror's knowing possible witnesses later in the trial. Defendant did not attempt to rebut these explanations or show that they were a pretext. The trial court then concluded that the peremptory strike of Ms. Edgeston was without purposeful racial discrimination.

Defendant argues on appeal that the rationales articulated by the prosecution were clearly pretext since the prosecutor never asked the prospective juror whether she could be fair and impartial in deciding the case even though she had some friends who had gone to school with defendant and since the prosecutor's rationale that problems with this juror's knowing witnesses might arise later in the trial

was purely hypothetical. We have reviewed the transcript and conclude that the prosecutor's explanations for the strike are supported in the record. The record indicates that the prospective juror was unsure whether she herself had gone to school with defendant. This Court has previously held that concerns about a prospective juror's knowing the defendant or witnesses were a sufficient basis to support an excusal for cause, *State v. Locklear*, 331 N.C. 239, 247-48, 415 S.E.2d 726, 731-32 (1992); moreover, a prosecutor's explanation for a peremptory strike "need not rise to the level justifying exercise of a challenge for cause," *Batson*, 476 U.S. at 97, 90 L. Ed. 2d at 88. The prosecutor in this situation was not required, as defendant urges, to ask the prospective juror whether she could be impartial even though she had friends who went to school with defendant; as long as the motive is not racial discrimination, a prosecutor may exercise peremptory challenges based on "legitimate 'hunches' and past experience." *State v. Porter*, 326 N.C. 489, 498, 391 S.E.2d 144, 151 (1990). We observe, in addition, that defendant proffered no rebuttal to show that any reason offered by the prosecution was a pretext. *See id.* at 501, 391 S.E.2d at 152 (defense counsel was apparently satisfied by the explanations offered by the prosecutor since no effort was made by the defense to demonstrate that the explanations were pretext). Thus, in this case the trial court's conclusion that there was no purposeful discrimination in the strike of prospective juror Edgeston is not clearly erroneous. *Fletcher*, 348 N.C. at 313, 500 S.E.2d at 680. This assignment of error is overruled.

## GUILT-INNOCENCE PHASE

[5] In defendant's next five assignments of error, he contends that the trial court erred in admitting portions of the State's evidence in violation of the North Carolina Rules of Evidence, the Due Process Clause of the Fourteenth Amendment to the United States Constitution, and the Law of the Land Clause of the North Carolina Constitution. First, defendant contends that the evidence of defendant's acts and threats of violence toward his girlfriend, Patricia Green, was inadmissible under N.C.G.S. § 8C-1, Rule 404(b) and that its probative value, if any, was substantially outweighed by the danger of unfair prejudice to defendant under N.C.G.S. § 8C-1, Rule 403. The crux of defendant's argument is that threats and acts of violence against Patricia Green have nothing to do with the murder of Georgia Green and Cleveland Wilson. We disagree.

The State presented evidence that defendant was determined to control Patricia to the point of assaulting her, kidnapping her at gun-

point, tying her to his bed, and threatening to kill her or her family if she tried to leave him. This evidence supported the State's theory that defendant killed the victims in retaliation against Patricia for resisting his control, for seeking the protection of her mother, and for telling defendant in her mother's presence that she did not want to be with him. The trial court correctly ruled that this evidence was admissible under Rule 404(b) to show that defendant's motive in killing Patricia's family members was retaliation and to identify defendant as the person who committed the murders. N.C.G.S. § 8C-1, Rule 404(b) (Supp. 1997). The evidence of defendant's acts of violence against Patricia, even though not part of the crimes charged, was admissible since it " 'pertain[ed] to the chain of events explaining the context, motive and set-up of the crime' " and " 'form[ed] an integral and natural part of an account of the crime . . . necessary to complete the story of the crime for the jury.' " *State v. Agee*, 326 N.C. 542, 548, 391 S.E.2d 171, 174-175 (1990) (quoting *United States v. Williford*, 764 F.2d 1493, 1499 (11th Cir. 1985)). Exclusion of evidence on the basis of Rule 403 is within the sound discretion of the trial court, and abuse of that discretion will be found on appeal only if the ruling is "manifestly unsupported by reason or is so arbitrary it could not have been the result of a reasoned decision." *State v. Syriani*, 333 N.C. 350, 379, 428 S.E.2d 118, 133, *cert. denied*, 510 U.S. 948, 126 L. Ed. 2d 341 (1993). Here, defendant is not able to show that the trial court abused its discretion.

[6] Second, defendant contends on the same grounds that the trial court improperly allowed evidence that eleven months prior to the murders, defendant took Patricia Green by force away from a fourth of July cookout and then fired a shotgun when members of her family came to check on her safety. We hold that evidence relating to this episode is also admissible under Rule 404(b) to show identity and motive, namely, retaliation for Patricia's resistance to defendant's forceful control. The trial court did not abuse its discretion in admitting the evidence under Rule 403.

[7] Third, defendant objects to evidence presented by the State that two years before the murders, defendant had gone to the house of Georgia Green and Cleveland Wilson with a shotgun, pointed it at Cleveland Wilson, and threatened to kill him. Defendant argues that no other evidence suggested continuing threats to Wilson by defendant or tied this episode to the murders and further contends that the remoteness of the threat to Wilson renders it irrelevant to this case. We disagree and conclude that defendant's earlier threat to kill

Cleveland Wilson is relevant to show the ill will between them, that the evidence is probative of defendant's motive and identity in committing the murders, and further, that the two-year span between the threat and the murders does not render the threat too remote to show motive and identity. "[R]emoteness in time is less significant when the prior conduct is used to show intent, motive, knowledge, or lack of accident; remoteness in time generally affects only the weight to be given such evidence, not its admissibility." *State v. Stager*, 329 N.C. 278, 307, 406 S.E.2d 876, 893 (1991); *see also State v. Hipps*, 348 N.C. 377, 405, 501 S.E.2d 625, 642 (1998).

[8] Fourth, defendant takes exception to the admission into evidence of shell casings found in Arizona, arguing that the State was unable to establish any relevance for the admission except that the casings were from a gun similar to that allegedly used by defendant; defendant also argues that the State failed to establish a clear chain of custody for the casings. Defendant's arguments are meritless. Arizona police, responding to a report of shots being fired in a certain area, found several freshly fired nine-millimeter shell casings; this site was not far from the motel where defendant was staying. Tests showed the casings were fired from the same gun, to the exclusion of all other guns, which fired the empty casings found beside the two murder victims' bodies in North Carolina and the empty shell casings found outside defendant's residence in North Carolina. The murder weapon was never located, but defendant had purchased a nine-millimeter handgun shortly before the murders. The relevance of the Arizona casings and their link to defendant and the murder is manifest. As for the chain of custody, no gap existed which may have rendered the casings irrelevant. Defendant has failed to identify any specific problem in the chain of custody, and our review of the record discloses none.

[9] Finally, defendant argues that the trial court should not have allowed the prosecutor to cross-examine defendant about offenses for which defendant was charged but not convicted. Defendant contends that the prosecutor's cross-examination went beyond the scope of N.C.G.S. § 8C-1, Rule 609; that the prosecutor impermissibly asked defendant about the facts underlying the charges; and that the prosecutor violated this Court's rule in *State v. Lynch* that the cross-examiner can elicit only "the name of the crime and the time, place, and punishment for impeachment purposes under Rule 609(a) in the guilt-innocence phase of a criminal trial." *State v. Lynch*, 334 N.C. 402, 410, 432 S.E.2d 349, 353 (1993). After reviewing the transcript of

the cross-examination, we conclude that the prosecutor did not improperly cross-examine defendant. The colloquy to which defendant objects is as follows:

Q. Do you recall that on November 11 of 1989 you were convicted of driving while license revoked in Lenoir County?

A. I can't recall specific dates, like I told you before. And like I told the jury, yes, I have been convicted of driving while license revoked.

Q. And weren't you also at that same time convicted of lying to a policeman by giving him fictitious information?

A. Like I said, I remember being charged and pleading guilty to driving while license revoked. Anything else, I don't remember.

Q. You don't remember lying to the policeman and getting charged—

[DEFENSE COUNSEL]: Objection.

THE COURT: Overruled.

Q. —with giving fictitious information?

A. Like I said, I remember being charged and pleading guilty to driving while license revoked.

Q. Is your name Melvin Lee White, Jr.?

A. Always has been.

Q. Did you at that time live at Route 1, Box 434?

A. What year was it?

Q. 1989. Did you ever live at Route 1, Box 434, anywhere?

A. Yes, I have.

Q. And your date of birth is September 5, 1966?

A. Yes, it is.

Q. I'll ask you again if you don't recall that you were convicted of giving fictitious information to a police officer?

A. Like I told you before, I remember pleading guilty to a driving while license revoked.

After questioning defendant about other convictions which he admitted, the prosecutor continued:

> Q. And then in September of 1992, also in Craven County, you were convicted of failure to stop for a blue light and siren and driving while license permanently revoked again?
>
> A. When was this?
>
> Q. September 3, 1992?
>
> A. Pled guilty to what, now?
>
> Q. Driving while license permanently revoked, and also failure to stop for a blue light and siren.
>
> A. Only thing I remember pleading guilty to is driving while license revoked. That's it.

This exchange reveals that the prosecutor properly asked defendant about his prior convictions but that defendant denied knowing anything about the specific offenses of which he was convicted. The prosecutor did not ask defendant about any "tangential circumstances of the crime[s]." *State v. King*, 343 N.C. 29, 49, 468 S.E.2d 232, 245 (1996). The questioning here "related to the factual elements of the crime[s]" and to necessary detail designed to jog defendant's memory. *Id.* In sum, defendant's assignments of error concerning the admission of evidence are overruled. Defendant also asks this Court to evaluate the cumulative prejudice that accrued to defendant from the admission of all this evidence; however, as we have found no error and no prejudice, there is no cumulative prejudice for this Court to evaluate.

[10] In defendant's next assignment of error, he contends that the trial court abused its discretion in allowing the State to lead its witnesses to such an extent that the State presented virtually its entire case through the use of leading questions in violation of the North Carolina Rules of Evidence, the Due Process Clause of the Fourteenth Amendment to the United States Constitution, and the Law of the Land Clause of the North Carolina Constitution. Defendant notes that Rule 611(c) of the North Carolina Rules of Evidence provides in pertinent part: "Leading questions should not be used on the direct examination of a witness except as may be necessary to develop his testimony." N.C.G.S. § 8C-1, Rule 611(c) (Supp. 1997).

STATE v. WHITE

[349 N.C. 535 (1998)]

Defendant first takes exception to the prosecutor's leading the State's chief witness, Patricia Green, beyond preliminary matters. Defense counsel objected repeatedly at trial, and the trial court entered the following findings:

> As to the leading, the Court's obviously in a position to take particular notice of the witness' demeanor. And it's obvious that she's very nervous and a very quiet person. . . . She stated this is the first time she's seen the defendant since last year. And with those factors, obviously, it's in the Court's discretion to determine the mode of questioning of any witnesses; and the Court feels that the questioning thus far, while it may [have] some leading aspect, really feels that it would be necessary for [the prosecutor] to question her in a manner in order to develop her testimony.
>
> Again, I would also note that basically everything—generally her testimony up to now was a lot of preliminary matters; but also, if the Court would not allow [the prosecutor] to question as he's done thus far, I think we would have a needless consumption of time. Therefore, [I] overrule[] the objection as to leading.

Later, after more testimony and further objections by defense counsel, the trial court again addressed the objection:

> Objection's overruled. The Court has stated for the record that the defendant—the Court has had the opportunity to observe the demeanor of the witness, and she has stated before that she's obviously very nervous, certainly not an articulate person, and this is the first time she has seen the defendant in quite some time; therefore, the Court is exercising in its discretion and its control to make effective . . . ascertainment of truth. There are some elements of [the prosecutor's] questioning that he will have to repeat himself to go back to preliminary matters and preparatory matters in order to, in the Court's opinion, to assist the witness in understanding exactly where she is. With that the last objection is overruled.

"A ruling on the admissibility of a leading question is in the sound discretion of the trial court, and these rulings are reversible only for an abuse of discretion." *State v. Marlow*, 334 N.C. 273, 286-87, 432 S.E.2d 275, 282-83 (1993). We have reviewed the transcript in these instances and conclude that the trial court, in recognizing the limitations of the witness under the circumstances and by allowing a mode of ques-

tioning which was necessary to develop the testimony, has not abused its discretion.

[11] Defendant also takes exception to what he claims are leading questions posed by the prosecutor to Officer Marvin Haddock of the Craven County Sheriff's Department. Officer Haddock was the deputy who was called to the scene where defendant had hit Ella Green with his car; while at the scene, the deputy received information from Jake Howard that defendant was at Georgia Green's house and that defendant had a gun. Defendant objected when the prosecutor asked Haddock the following questions:

> Q. Mr. Haddock, let me ask you if you recall anyone ever having said anything to you at that location during that time about the defendant having a gun?
>
> . . . .
>
> Q. But you do recall somebody making a statement to you about the defendant having a gun?

"A leading question has been defined [by this Court] as one which suggests the desired response and may frequently be answered 'yes' or 'no.' However, a question is not always considered leading merely because it may be answered 'yes' or 'no.' " *State v. Burrus*, 344 N.C. 79, 90, 472 S.E.2d 867, 875 (1996). A question is not leading where it directs the witness toward a specific matter to be addressed without suggesting an answer. *Id.*; *see also State v. Greene*, 285 N.C. 482, 492-93, 206 S.E.2d 229, 236 (1974). Here, the prosecutor was attempting to turn the witness' attention from the details of the assault at Ella Green's house to what the deputy heard, while at Ella Green's house, about another matter which took place elsewhere. We conclude that the trial court did not abuse its discretion in allowing this questioning, and we overrule defendant's assignment of error.

[12] Defendant next argues that the trial court committed prejudicial constitutional error in failing to intervene during the prosecution's closing argument when the prosecutor argued to the jury as follows:

> You've heard their version and their side and their arguments about what the evidence shows in this case. Now, they have a job in this case. They have a duty to perform. It's their job to represent Melvin Lee White, Jr. Regardless of the truth, regardless of facts, their job is this: [t]o convince you 12 folks to turn him loose.

Defendant maintains that the prosecutor impugned the integrity of counsel for the defense by accusing the defense of manufacturing a defense regardless of the truth. We note preliminarily that since defendant did not object at trial, the burden is on defendant to "demonstrate that the prosecutor's closing arguments amounted to gross impropriety." *State v. Rouse*, 339 N.C. 59, 91, 451 S.E.2d 543, 560 (1994), *cert. denied*, 516 U.S. 832, 133 L. Ed. 2d 60 (1995).

"It is well-established that a trial attorney may not make uncomplimentary comments about opposing counsel, and should 'refrain from abusive, vituperative, and opprobrious language, or from indulging in invectives.' " *State v. Sanderson*, 336 N.C. 1, 10, 442 S.E.2d 33, 39 (1994) (quoting *State v. Miller*, 271 N.C. 646, 658-59, 157 S.E.2d 335, 346 (1967). In this case the prosecutor did not use abusive, vituperative, or opprobrious language; nor did the prosecutor impugn the integrity of defense counsel or repeatedly attempt to diminish defense counsel before the jury. Immediately after that portion of the argument about which defendant complains, the prosecutor stated: "And I would say to you they've done a good job. They're good lawyers. They're honorable men."

Moreover, defense counsel in arguing to the jury argued:

> The State made a rush to prosecution in this case based on statements of Patricia Green and . . . the insistence of Ella Green . . . . However, standing here now, . . . we say to you that the allegations of domestic violence were exaggerated at best, fabricated at worst, and not in any way sufficient to establish a motive for Melvin White to kill Georgia Green and Cleveland Wilson.

The prosecutor is entitled to respond to defense counsel's imputations of bad faith on the part of the prosecutor and police investigators. *State v. Payne*, 312 N.C. 647, 665, 325 S.E.2d 205, 217 (1985).

After reviewing the prosecutor's argument in context, we conclude that the prosecutor was merely responding to defense counsel's comments and that the prosecutor's statements were not so grossly improper as to require the trial court to intervene *ex mero motu*. Defendant's assignment is overruled.

## SENTENCING PROCEEDING

**[13]** In defendant's next assignment of error, he contends that the trial court abused its discretion by ordering defendant to be shackled during the sentencing proceeding, thereby violating defendant's fed-

eral and state due process rights. Defendant argues that such physical restraints were not reasonably necessary and that the court did not consider other, less-restrictive alternatives to preserve the security of the courtroom. This issue is governed by N.C.G.S. § 15A-1031, which provides that given proper procedure, which is not contested here, a trial judge may order a defendant subjected to physical restraint in the courtroom when the judge finds the restraint to be "reasonably necessary to maintain order, prevent defendant's escape, or provide for the safety of persons." N.C.G.S. § 15A-1031 (1997); *see also State v. Tolley*, 290 N.C. 349, 226 S.E.2d 353 (1976). In this case, after the jury announced its guilty verdict and after the individual jurors were polled, the trial court asked defense counsel if there was anything further they wanted to present in the guilt-innocence phase of the trial. Defense counsel responded that they had nothing further. Defendant himself, however, rose and addressed the court, saying, "Yes, it is, sir. Judge, I would like for my counsel to be released from my case at this time." The trial court told defendant that the matter would be taken up later in the day, and then excused the jury. The trial court then noted the following:

> For purposes of the record, let me state that upon completion of polling the jury, that the defendant made an outburst in court. He was—both defense counsel [were] attempting to restrain him, keep him from saying anything or standing up in court, but there was an outburst. The defendant basically said that he wanted to dismiss his counsel.

> The Court acknowledged the fact of what he said, and we will take that matter up in a little while. Probably twenty minutes from now. Which brings us to the issue of whether or not to allow the defendant in the courtroom without having leg shackles. If the Court did entertain that idea, it would be discreetly done. The jury would . . . come in and out of the courtroom with . . . the defendant previously [having been seated] in the courtroom before they arrive. And he would exit the courtroom after the jury left. It would not be a visible thing to the sentencing jury unless he [defendant] made it so.

> I would also entertain any comments from the State and from the defense, not only the outburst, but the issue we have before us. I would rather you comment on the outburst[] so that it wouldn't be solely my characterization. I would like to hear from all of you.

The court then heard from the prosecutor, who noted as to the outburst that defendant seemed "somewhat angry" and that, given his physical strength, defendant posed more of a risk after receiving the guilty verdicts than he had previously. The court then noted the verdicts and stated that animosity is typical in such cases; the court then opined that it may be natural for defendant to turn on his lawyers and that, for this reason, the court was concerned about defense counsel's security and safety. Defendant's two trial counsel then voiced opposition to the shackling, arguing that defendant had shown remarkable restraint until that point and that what was being characterized as an outburst was not in fact a physically threatening gesture toward them or anyone else. Defense counsel also noted the possible prejudice to defendant's case if the jury saw him in shackles. The trial court stated in response that the gesture he saw defendant make was indeed physically threatening and that given the presence of spectators in the courtroom and a possible change in attitude on defendant's part in light of his convictions, the court was not going to take any risks. The court then ordered that defendant be shackled while in the courtroom.

After reviewing the transcript, we conclude that the trial court did not abuse its discretion in ordering defendant shackled; the decision was a rational exercise of the court's discretion and was reasonably necessary to maintain order or to provide for the safety of persons. N.C.G.S. § 15A-1031. Defendant argues that the court reporter noted nothing unusual, such as forcefulness or physical menace, concurrent with defendant's request to release counsel; defendant also argues that the trial court seemed to embellish its characterization of the violence of the outburst as the discussions proceeded. We do not find the lack of a notation from the court reporter dispositive on the issue of whether shackles were reasonably necessary, and we disagree with defendant's contention that the trial court expanded its characterization of defendant's statement. On the contrary, the trial court refrained from undue comment until fully hearing from the State and defense counsel on the matter.

Defendant also argues that a trial court has a duty to explore lesser means of restraint before shackling a defendant and that, in this case, the trial court considered no lesser means to enhance security in the courtroom before shackling defendant. We disagree. Defendant cites no law from this Court establishing such a duty; moreover, the trial court in this case both considered and employed lesser alternatives prior to shackling defendant. The transcript

reveals that earlier in the trial, prior to the opening statements of the parties, the trial court gave consideration to the State's concerns about increased courtroom safety; at that time, the court specifically declined to order defendant shackled and, as a lesser measure, ordered that there be more bailiffs and more security personnel in the courtroom. When defendant finally was shackled, at sentencing, he did not request or suggest any alternatives to the trial court; and defendant, in his brief to this Court, has suggested no alternative that the trial court could have used. Defendant also argues that the jury may have seen or heard the leg shackles on defendant during the sentencing proceeding and, finally, that the shackles may have affected defendant's demeanor in court, including a possible chilling effect on his decision whether to testify during sentencing. However, nothing in the record suggests that these possibilities raised on appeal actually occurred at trial. This assignment of error is overruled.

**[14]** Defendant next assigns error to the trial court's denial of defendant's request to release his court-appointed counsel from the sentencing proceeding. The transcript indicates that at the close of the guilt-innocence phase, after the jury had returned its verdicts of guilty on all three counts and each juror had responded to individual polling, the trial court asked, "Anything further for this jury in the guilt-innocence phase for the defendant?" Defense counsel responded, "No, Your Honor." At this point defendant himself addressed the court and stated, "Yes, it is, sir. Judge, I would like for my counsel to be released from my case at this time." After excusing the jury and taking care of some other matters, the trial court heard from defendant on his request; and the following colloquy took place:

> [THE COURT:] . . . Mr. White, when you were here while ago, you said something about wanting to release your counsel; is that right?
>
> DEFENDANT: Yes, sir.
>
> THE COURT: Let me ask you this, Mr. White. You need to give me a reason for that.
>
> DEFENDANT: My reason why is that I want them released; they have done all the services they can do. I have no further need for them. Verdict done been passed, you know. As far as I am concerned, they just as soon give me the death penalty.
>
> THE COURT: I understand your position, Mr. White. Thank you, Mr. White, for your comments.

Let me ask you this way, Mr. White: I take it you're just basically saying that you want the death penalty?

DEFENDANT: I'm saying that—not that I want it; but what I'm saying is they have done all the services they could do for me, as far as I'm concerned. I got no need to be coming back in here anymore. They have made their decision. Mr. McFadyen [the prosecutor] is happy with what he got. I'm not satisfied, though.

THE COURT: I understand your position better, Mr. White. Mr. White, actually at the next phase of this matter, it is extremely important that you [be] represented. You're now facing either life imprisonment without parole or you're facing the death penalty. I would not in all fairness to you relieve these counsel of their duty to continue through with this matter. And I can also tell you that it is very important that you have competent legal counsel in the next phase of this proceeding. And you obviously have two excellent lawyers. I couldn't get two better for you.

DEFENDANT: Yes.

THE COURT: I couldn't get two better for you. But I will not relieve them from their duties. And with that being said, I would deny your motion for release of counsel. Mr. Barnhill and Mr. Willey, you will continue on in this matter.

This colloquy reveals that defendant's reason for wanting to release counsel was, at its core, his feeling at the time that "they ha[d] done all the services they could" for him and that whatever was to come next was unimportant compared to the guilty verdicts he had just received. After the trial court elicited from defendant that defendant did not, in fact, want to be put to death, the court advised defendant that it was extremely important that he have representation for the sentencing proceeding, in which the jury would decide whether he would be imprisoned for life or put to death. Defendant then expressed agreement that his lawyers were excellent; he expressed no dissatisfaction with his counsel. Significantly, defendant did not request to represent himself in the sentencing proceeding. "Statements of a desire not to be represented by court-appointed counsel do not amount to expressions of an intent to represent oneself." *State v. Hutchins*, 303 N.C. 321, 339, 279 S.E.2d 788, 800 (1981). From the record it appears to this Court that defendant was understandably depressed about the guilty verdicts and was not fully aware of the sentencing proceeding's very real consequences to his life. Nor

was he fully aware of the nature of the sentencing proceeding as evidenced by his statement that he had "no need to be coming back in here anymore."

The right to counsel provided by the Sixth Amendment to the United States Constitution also provides the right to self-representation. *Faretta v. California*, 422 U.S. 806, 45 L. Ed. 2d 562 (1975); *see also* N.C. Const. art. I, § 23; *State v. Mems*, 281 N.C. 658, 670-71, 190 S.E.2d 164, 172 (1972). We have held, in accordance with the Sixth Amendment, that it is error for a trial court to allow a criminal defendant to release his counsel and proceed *pro se* unless, first, the defendant expresses "clearly and unequivocally" his election to proceed *pro se* and, second, the defendant knowingly, intelligently, and voluntarily waives his right to in-court representation. *State v. Thomas*, 331 N.C. 671, 673-74, 417 S.E.2d 473, 475-76 (1992). Defendant did not meet this test in this case. Although part of his statement was, "I want them released," he did not clearly express his desire for, nor was he fully aware of the consequences of, proceeding *pro se*. He had to be informed by the trial court that he was wrong in his initial impression that there was nothing more that his counsel could do for him and that, on the contrary, it was very important that he retain counsel for the sentencing proceeding. We overrule this assignment of error.

[15] In defendant's next assignment of error, he contends that the trial court erred in interfering with defense counsel's ability to effectively represent defendant at sentencing by allowing defendant's wishes to prevail over defense counsel's strategy to present certain mitigating evidence.

During sentencing, after defense counsel had presented mitigating evidence through the examination of three witnesses, defense counsel asked to be heard by the trial court outside the presence of the jury. Counsel informed the court that as he was about to ask defendant's aunt about the history of domestic violence and abuse in the family while defendant was growing up, defendant leaned over to him and told him not to pursue that line of questioning. The trial court agreed to hear from defendant personally; and defendant expressed his wishes, telling the court, "My family as far as that goes have nothing to do with this case at all . . .[;] what they did, ain't got nothing to do with this right here. I don't feel like it should be brought out. I don't feel like it should come before anybody in this courtroom. Not even you." The trial court asked defendant if it would make any

difference if the courtroom were cleared except for the jurors and attorneys; and defendant replied, "I don't want it brought out, period." Defendant made it clear that he did not want any evidence about his family brought out, whether it be through his aunt or any other family member, or anybody else. The prosecutor then interjected that perhaps defendant should be advised on the record about why such evidence is important, to the extent that his counsel believed it to be important evidence to present during the sentencing proceeding. Defendant broke in and explained his position in the following colloquy:

DEFENDANT: I see why they say that they think it's important. But it would be further contradictory to what I [testified to] earlier. And what I said earlier, I did not inflict any domestic violence on Patricia or anybody else. And by them bringing this out, they're [the jurors] just going to be saying, well, he seen it somewhere, so he must have done it. So I know better than that.

THE COURT: So you're really saying, Mr. White, it could be used against you—

DEFENDANT: Surely. That's what it's going to be, used totally against me. It's going to be just like when I got up on the stand, whatever I said was a lie. Which it come out that way anyway, because I've been convicted. Whatever they thought that I said, they think I told a lie.

THE COURT: Let me ask you this. I think what you're saying is even though your attorneys believe it would help you, you foresee the possibility that it may hurt you.

DEFENDANT: It will hurt me. Not may, but will.

THE COURT: Okay.

DEFENDANT: Like I said, it would be totally contradictory to what I said earlier as far as me not inflicting any domestic violence on anybody. And then the jury's going to say, well, he must [have] lied about that; he lied about everything else. So we're going to give him whatever, you know.

Defense counsel then asked the court not to tie the defense's hands, even at defendant's request, since the defense is charged with presenting mitigating evidence. Defense counsel also explained that they had advised defendant at some substantial length that the line of evidence in question would be presented not to excuse what he had

been convicted of, but to explain his inability "to make informed judgments about doing those things." The court then addressed defense counsel:

> THE COURT: Mr. Barnhill, when I discussed this matter with Mr. White [defendant]—and this may be something you are aware of or not aware of. While your position in representing Mr. White is that this would be a mitigating matter, Mr. White quite forcibly said that in his opinion it could be an aggravating factor, and it could be used against him. In other words, your contention is this may somewhat mitigate Mr. White's circumstances, but I hear him pretty clearly say that he feels just the opposite, that this may be what really aggravates the matter. It is a valid point.

After a short recess, the trial judge confirmed with defendant his understanding of defendant's contention and then ruled that the court would not allow questions about domestic violence in defendant's home as he was growing up:

> THE COURT: I thought that's what was your position. That's fine. You will have a seat, Mr. White.
>
> What we'll do is I'm not going to allow that line of questioning. That will be the ruling. And I think Mr. White has stated his reasons. The Court feels that it is the defendant's life that we are talking about. And for the reasons he's stated, which I feel . . . are justified, . . . I will not allow the line of questioning.

After allowing defense counsel to state on the record their reasoning for wanting to present the evidence, the trial court reiterated its findings, stating:

> THE COURT: Let me go back. My findings of fact, obviously from the record, that this is not so much . . . a matter of the defendant not consenting to something as it is that the defendant's position is that this whole matter and line of questioning could just as easily be used as an aggravating matter rather than a mitigating factor. And the course of conduct by the defendant, which he has already stated, would again possibly be so prejudicial to him that it could conceivably weigh the scales to the most aggravating side.

The court then made even more explicit its finding that, "in the [c]ourt's mind, [there] certainly is the possibility that testimony of this nature could well be aggravating instead of mitigating."

STATE v. WHITE

[349 N.C. 535 (1998)]

Defendant now argues that the trial court, by ruling in accordance with defendant's request that no evidence be presented regarding acts of domestic violence in defendant's home while he was growing up, deprived defendant's counsel of any opportunity to be effective and, in doing so, deprived both defendant and the people of this state of a regularly applied, fair, and nonarbitrary capital-sentencing proceeding under the Eighth and Fourteenth Amendments to the United States Constitution. We disagree.

Preliminarily, we note that defense counsel were not prohibited from presenting all mitigating evidence. Defense counsel examined nine witnesses on the circumstances of defendant's life and various aspects of his character and submitted to the jury two statutory mitigating circumstances, seven nonstatutory mitigating circumstances, and the catchall circumstance. Defendant has cited a case from another jurisdiction, *State v. Koedatich*, 112 N.J. 225, 548 A.2d 939 (1988), *cert. denied*, 488 U.S. 1017, 102 L. Ed. 2d 803 (1989), for the proposition that a criminal defendant should not be allowed, out of fairness in sentencing, to prevent the presentation of mitigating evidence. We find the reasoning in *Koedatich* inapposite to this case in that the defendant in *Koedatich* waived the right to present any mitigating evidence whatsoever to the jury. *Id.* at 327-28, 548 A.2d at 992.

The United States Supreme Court has held that the Eighth and Fourteenth Amendments mandate that a jury in a capital case must " 'not be precluded from considering *as a mitigating factor*, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death.' " *State v. Wilkinson*, 344 N.C. 198, 211, 474 S.E.2d 375, 381 (1996) (quoting *Lockett v. Ohio*, 438 U.S. 586, 604, 57 L. Ed. 2d 973, 990 (1978)). This mandate, however, presupposes that defendant has proffered the evidence and that the evidence is in fact mitigating. The Eighth and Fourteenth Amendments do not require a defendant to acquiesce in a trial strategy to present evidence which the defendant reasonably believes will be aggravating rather than mitigating. Defendant argues that the evidence of defendant's violent home could have lent additional support to the (f)(2) statutory mitigator, that the murders were committed while defendant was under the influence of mental or emotional disturbance, N.C.G.S. § 15A-2000(f)(2) (1997); but this contention ignores the question whether the evidence would harm defendant more than help him in this case.

STATE v. WHITE

[349 N.C. 535 (1998)]

As the colloquy between the court and defendant reveals, an impasse existed between defendant and his counsel over the tactical decision of whether the evidence in question would tend to mitigate defendant's sentence or aggravate it. Normally, the responsibility for tactical decisions, such as the type of defense to present and what witnesses to call, "rests ultimately with defense counsel." *State v. McDowell*, 329 N.C. 363, 384, 407 S.E.2d 200, 211 (1991). However, as we have said, "when counsel and a fully informed criminal defendant client reach an absolute impasse as to such tactical decisions, the client's wishes must control; this rule is in accord with the principal-agent nature of the attorney-client relationship." *State v. Ali*, 329 N.C. 394, 404, 407 S.E.2d 183, 189 (1991). In *Ali* we stated that when such impasses arise, defense counsel should make a record of the circumstances, the advice given to the defendant, the reasons for the advice, the defendant's decision, and the conclusion reached. *Id.* After reviewing the transcript in this case of the discussion between the trial court, defendant, and defense counsel, we conclude that there was an absolute impasse between defendant and his counsel over the presentation of evidence concerning domestic violence while defendant was growing up. Defendant even stated that he would make whatever disturbance was necessary to prevent the evidence from being presented. We conclude further that defendant was fully informed and that defense counsel made a proper record of the circumstances, including their advice to defendant and the reasons for their decision to present the evidence. Thus, we hold that the trial court did not err in prohibiting counsel from presenting the controversial evidence.

Defendant further argues that the trial court erred in precluding defense counsel from making an offer of proof as to what evidence they would have presented concerning the domestic violence experienced by defendant as a child. We note that while the trial court denied full offer of proof, it allowed defense counsel to articulate what defendant's showing would have been by identifying witnesses and presenting a detailed forecast of evidence for the record on what each witness would have said. Moreover, since we have concluded that the trial court did not err in precluding defense counsel from presenting the evidence, the trial court's denial of the offer of proof has not prejudiced defendant on appeal. This assignment of error is overruled.

**[16]** Defendant next assigns error to the trial court's failure to give a peremptory instruction to the jury on the (f)(2) statutory mitigating

circumstance, that the murders were committed while defendant was under the influence of mental or emotional disturbance. N.C.G.S. § 15A-2000(f)(2). The trial court stated as its reason for not giving the peremptory instruction that "[w]hether the defendant was under [the] influence of emotional disturbance, again, that is a jury call. I can't take that as a matter of law." Defendant contends that this statement indicates that the court based its denial on the mistaken belief that the court was without legal authority to grant a peremptory instruction. We disagree with defendant's interpretation of the trial court's statement; when read in context, the trial court's statement was merely a recognition that the evidence in this case was conflicting. A defendant is entitled to a peremptory instruction when a mitigating circumstance is supported by uncontroverted evidence. *State v. Womble*, 343 N.C. 667, 683, 473 S.E.2d 291, 300 (1996), *cert. denied*, 519 U.S. 1095, 136 L. Ed. 2d 719 (1997). "Conversely, a defendant is not entitled to a peremptory instruction when the evidence supporting a mitigating circumstance is controverted." *Id.*

In this case the evidence of whether, at the time of the murders, defendant was under the influence of a mental or emotional disturbance was not uncontroverted. Defendant had purchased a nine-millimeter handgun shortly before the murders, and he had threatened to kill Patricia Green's family members. Defendant himself testified that he did not murder Georgia Green and Cleveland Wilson; that he had decided to leave Patricia Green and leave town; and that he visited several friends that evening as he made his preparations to leave. *See State v. Noland*, 312 N.C. 1, 23, 320 S.E.2d 642, 655-56 (1984) (defendant bought the murder weapon two days before the killings and, in a nonemotional state of mind, killed the victims in the exact manner in which he threatened, going through a "detailed series of steps . . . before, during, and after the killing[,] suggest[ing] deliberation, not the frenzied behavior of an emotionally disturbed person"), *cert. denied*, 469 U.S. 1230, 84 L. Ed. 2d 369 (1985). This assignment of error is overruled.

[17] In defendant's next assignment of error, he contends that the trial court erred in failing to give peremptory instructions to the jury regarding nonstatutory mitigating circumstances despite having agreed to give such instructions during the charge conference. The transcript reveals that at the charge conference defense counsel made an oral request for the submission of nonstatutory mitigating circumstances. The trial court asked the prosecutor if he objected to the submission of the nonstatutory mitigating circumstances, and the

**STATE v. WHITE**

[349 N.C. 535 (1998)]

prosecutor responded that he did not. Thereafter, defense counsel orally requested that peremptory instructions be given for the non-statutory mitigating circumstances. The prosecutor then asked whether defense counsel was requesting peremptory instructions for the nonstatutory mitigating circumstances; and defense counsel responded, "That's correct." Defense counsel did not provide written instructions at this point, but merely cited N.C.P.I.—Crim. 150.11 as the appropriate pattern instruction. The prosecutor then referred to the pattern book and pointed out to defense counsel and the trial court that N.C.P.I.—Crim. 150.11 provides a pattern peremptory instruction only for statutory mitigating circumstances, not for non-statutory mitigating circumstances. After recessing and then resuming the charge conference, the trial court agreed to give peremptory instructions on the nonstatutory mitigating circumstances and told counsel the language he would use:

> [THE COURT:] So as I read it—nonstatutory mitigating factors—I will take an example and read it like this and see if this is what you agree with. On the first nonstatutory mitigating factor the issue would be: "Consider whether the defendant was raised in a poverty stricken home. You would find this mitigating factor if you so find the defendant was raised in a poverty stricken home and that this circumstance has mitigating value. If one or more of you finds by the preponderance of the evidence this circumstance exists and is also deemed mitigating, you would so indicate by having your foreperson write 'yes' in the space provided after this mitigating factor on the issue and recommendation form. If none of you finds the circumstance to exist, or if none of you deem it to have mitigating value, you would so indicate by having your foreperson write 'no' in that space." I will follow that sequence in all of the nonstatutory mitigating factors.

> [DEFENSE COUNSEL]: Yes.

Defense counsel thus agreed with this proposed language, made no objection to it, and neither suggested nor provided any other language either orally or in writing. Thereafter, the trial court instructed the jury exactly as it had indicated. Defense counsel did not object at this point either, though given the opportunity.

We have held that peremptory instructions which are appropriate for statutory mitigating circumstances are inappropriate for non-statutory mitigating circumstances. *State v. Green*, 336 N.C. 142, 173-74, 443 S.E.2d 14, 32, *cert. denied*, 513 U.S. 1046, 130 L. Ed. 2d 547

(1994); *see also State v. Buckner*, 342 N.C. 198, 235, 464 S.E.2d 414, 435 (1995), *cert. denied*, 519 U.S. 828, 136 L. Ed. 2d 47 (1996). This distinction is due to the disparate nature of the two types of mitigating circumstances under our capital-sentencing procedure; a jury that finds a statutory mitigating circumstance to exist must accord it mitigating value, but a jury which finds the existence of a nonstatutory mitigating circumstance may still decide that the circumstance has no mitigating value. *Green*, 336 N.C. at 173, 443 S.E.2d at 32. Thus, in this instance, the trial court was correct not to utilize the pattern instruction suggested by defense counsel in reference to the nonstatutory mitigating circumstances submitted in this case.

Further, we have held that it is not error for a trial court in a capital case to refuse to give requested instructions where counsel failed to submit the instructions to the trial court in writing. *State v. McNeill*, 346 N.C. 233, 240, 485 S.E.2d 284, 288 (1997), *cert. denied*, —— U.S. ——, 139 L. Ed. 2d 647 (1998); *see also* N.C.G.S. § 1-181 (1996); N.C.G.S. § 1A-1, Rule 51(b) (1990). Here, defense counsel did not submit any proposed instructions in writing. Counsel also did not object when given the opportunity either at the charge conference or after the charge had been given. In fact, defense counsel affirmatively approved the instructions during the charge conference. Where a defendant tells the trial court that he has no objection to an instruction, he will not be heard to complain on appeal. *State v. Wilkinson*, 344 N.C. at 213, 474 S.E.2d at 396. We overrule this assignment of error.

[18] In his next assignment of error, defendant contends that the trial court's instructions on Issues Three and Four, which used the word "may" rather than "must," improperly allowed the jurors to ignore mitigating circumstances which they had found to exist. The trial court instructed as follows, in accordance with the pattern instructions: "If you find from the evidence one or more mitigating circumstances, you must weigh the aggravating circumstance or circumstances against the mitigating circumstance or circumstances. When deciding this issue, each juror may consider any mitigating circumstance or circumstances that the juror determined to exist by a preponderance of the evidence in Issue Two." We have previously addressed and rejected arguments identical to those made by defendant in support of this assignment of error. *State v. Carter*, 338 N.C. 569, 604-05, 451 S.E.2d 157, 176-77 (1994), *cert. denied*, 515 U.S. 1107, 132 L. Ed. 2d 263 (1995). This assignment is overruled.

## PROPORTIONALITY

**[19]** Finally, defendant argues that the sentence of death in this case was imposed under the influence of passion, prejudice, or other arbitrary considerations and that, based on the totality of the circumstances, the death penalty is disproportionate. We are required by N.C.G.S. § 15A-2000(d)(2) to review the record and determine (i) whether the record supports the jury's findings of the aggravating circumstances upon which the court based its death sentence; (ii) whether the sentence was imposed under the influence of passion, prejudice, or any other arbitrary factor; and (iii) whether the death sentence is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant. *State v. McCollum*, 334 N.C. 208, 239, 433 S.E.2d 144, 161 (1993), *cert. denied*, 512 U.S. 1254, 129 L. Ed. 2d 895 (1994).

After a thorough review of the transcript, record on appeal, and briefs and oral arguments of counsel, we are convinced that the jury's findings of the two aggravating circumstances submitted as to each murder were supported by the evidence. We also conclude that nothing in the record suggests that defendant's death sentence was imposed under the influence of passion, prejudice, or any other arbitrary factor.

**[20]** Finally, we must consider whether the imposition of the death penalty in defendant's case is proportionate to other cases in which the death penalty has been affirmed, considering both the crime and the defendant. *State v. Robinson*, 336 N.C. 78, 133, 443 S.E.2d 306, 334 (1994), *cert. denied*, 513 U.S. 1089, 130 L. Ed. 2d 650 (1995). The purpose of proportionality review is "to eliminate the possibility that a person will be sentenced to die by the action of an aberrant jury." *State v. Holden*, 321 N.C. 125, 164-65, 362 S.E.2d 513, 537 (1987), *cert. denied*, 486 U.S. 1061, 100 L. Ed. 2d 935 (1988). Proportionality review also acts "[a]s a check against the capricious or random imposition of the death penalty." *State v. Barfield*, 298 N.C. 306, 354, 259 S.E.2d 510, 544 (1979), *cert. denied*, 448 U.S. 907, 65 L. Ed. 2d 1137 (1980). Our consideration is limited to those cases within the pool which are roughly similar as to the crime and the defendant, but we are not bound to cite every case used for comparison. *Syriani*, 333 N.C. at 400, 428 S.E.2d at 146. Whether the death penalty is disproportionate "ultimately rest[s] upon the 'experienced judgments' of the members of this Court." *Green*, 336 N.C. at 198, 443 S.E.2d at 47.

**STATE v. WHITE**

[349 N.C. 535 (1998)]

Defendant was convicted of two counts of first-degree murder based on premeditation and deliberation. As to each murder, the jury found both the submitted aggravating circumstances: (i) that defendant had previously been convicted of a felony involving the use or threat of violence to the person, N.C.G.S. § 15A-2000(e)(3), and (ii) that the murder was part of a course of conduct in which defendant engaged and which included the commission by defendant of other crimes of violence against another person or persons, N.C.G.S. § 15A-2000(e)(11).

Three statutory mitigating circumstances were submitted for the jury's consideration: (i) defendant has no significant history of prior criminal activity, N.C.G.S. § 15A-2000(f)(1); (ii) the murder was committed while defendant was under the influence of mental or emotional disturbance, N.C.G.S. § 15A-2000(f)(2); and (iii) the catchall mitigating circumstance that there existed any other circumstance arising from the evidence which the jury deemed to have mitigating value, N.C.G.S. § 15A-2000(f)(9). The jury found the (f)(2) mitigator, that the murder was committed while defendant was under the influence of mental or emotional disturbance; the jury also found as a circumstance supporting the (f)(9) mitigator defendant's "[f]ather's possessive influence over mother's in family life." The jury declined to find the (f)(1) mitigator, that defendant had no significant history of prior criminal activity. Of the six nonstatutory mitigating circumstances submitted, five were found by the jury.

We begin our analysis by comparing this case to those cases in which this Court has determined the sentence of death to be disproportionate. This Court has determined the death sentence to be disproportionate on seven occasions. *State v. Benson*, 323 N.C. 318, 372 S.E.2d 517 (1988); *State v. Stokes*, 319 N.C. 1, 352 S.E.2d 653 (1987); *State v. Rogers*, 316 N.C. 203, 341 S.E.2d 713 (1986), *overruled on other grounds by State v. Gaines*, 345 N.C. 647, 483 S.E.2d 396, *cert. denied,* —— U.S. ——, 139 L. Ed. 2d 177 (1997), *and by State v. Vandiver*, 321 N.C. 570, 364 S.E.2d 373 (1988); *State v. Young*, 312 N.C. 669, 325 S.E.2d 181 (1985); *State v. Hill*, 311 N.C. 465, 319 S.E.2d 163 (1984); *State v. Bondurant*, 309 N.C. 674, 309 S.E.2d 170 (1983); *State v. Jackson*, 309 N.C. 26, 305 S.E.2d 703 (1983). This case is not substantially similar to any of the cases in which this Court has found that the death sentence was disproportionate.

This Court has never found the sentence of death disproportionate where the defendant has been convicted of the murders of more than one person. *State v. Warren*, 348 N.C. 80, 129, 499 S.E.2d 431,

459, *cert. denied*, —— U.S. ——, 142 L. Ed. 2d 216 (1998); *State v. McLaughlin*, 341 N.C. 426, 466, 462 S.E.2d 1, 23 (1995), *cert. denied*, 516 U.S. 1133, 133 L. Ed. 2d 879 (1996). This defendant has been found guilty of the premeditated and deliberate murders of two unsuspecting, defenseless victims in their own home, in retaliation against his girlfriend for leaving him. This case is similar to *State v. Noland*, 312 N.C. 1, 320 S.E.2d 642 (1984), in which Noland killed the father and sister of his estranged wife after threatening to kill them if she did not return to him. *Id.* at 5-6, 320 S.E.2d at 645-46. We found no error in that case and affirmed the defendant's sentences of death.

Although we review all the cases in the pool when engaging in this statutory duty, as we have repeatedly stated, "[W]e will not undertake to discuss or cite all of those cases each time we carry out that duty." *McCollum*, 334 N.C. at 244, 433 S.E.2d at 164. We conclude that the present case is more similar to certain cases in which we have found the sentence of death proportionate than to those in which we have found the sentence disproportionate or those in which juries have consistently returned recommendations of life imprisonment.

Accordingly, we conclude that defendant received a fair trial and sentencing proceeding, free from prejudicial error, and that the sentence of death ordered by the trial court upon the jury's recommendation for each murder is not disproportionate.

NO ERROR.