IN THE SUPREME COURT OF NORTH CAROLINA

No. 263PA18-2

Filed 6 April 2023

STATE OF NORTH CAROLINA

v.

CEDRIC THEODIS HOBBS, JR.

On appeal pursuant to the Supreme Court's decision in *State v. Hobbs*, 374 N.C. 345, 841 S.E.2d 492 (2020), after remand to the Superior Court, Cumberland County, for further proceedings. Heard in the Supreme Court on 8 February 2023.

> *Joshua H. Stein, Attorney General, by Jonathan P. Babb Sr., Special Deputy Attorney General, and Zachary K. Dunn, Assistant Attorney General, for the State-appellee.*
>
> *Glenn Gerding, Appellate Defender, by Sterling Rozear, Assistant Appellate Defender, for defendant-appellant.*
>
> *Elizabeth Simpson and Joseph Blocher for Social Scientists, amicus curiae.*

NEWBY, Chief Justice.

In this case, applying the well-established standard of review, we must determine whether the trial court clearly erred in concluding there was no violation of *Batson v. Kentucky*, 476 U.S. 79, 106 S. Ct. 1712 (1986). This case is before us for the second time after this Court remanded it to the trial court to conduct further proceedings under *Batson*. Specifically, this Court ordered the trial court to conduct a hearing under the third step of *Batson* and instructed it to consider specific factors in making its decision. *See State v. Hobbs* (*Hobbs I*), 374 N.C. 345, 360, 841 S.E.2d

492, 503–04 (2020). Thus, only the third step of *Batson* is at issue here. In reviewing the trial court's order, we apply the well-established standard of review which affords "great deference" to the trial court's determination unless it is clearly erroneous. *Id.* at 349, 841 S.E.2d at 497 (quoting *State v. Golphin*, 352 N.C. 364, 427, 533 S.E.2d 168, 211 (2000)). After reviewing the trial court's findings of fact and conducting our own independent review of the entire evidence, we hold that the trial court's conclusion that there was no *Batson* violation is not clearly erroneous. We affirm.

## I. Procedural History

In *Hobbs I*, this Court remanded this case to the trial court to conduct a hearing and make findings of fact under the third *Batson* step, namely whether defendant proved the State engaged in purposeful discrimination in peremptorily striking three black prospective jurors.[1] *Id.* at 347, 841 S.E.2d at 496. Specifically, this Court instructed the trial court to consider the following:

> On remand, considering the evidence in its totality, the trial court must consider whether the primary reason given by the State for challenging juror McNeill was pretextual. This determination must be made in light of all the circumstances, including how McNeill's responses during voir dire compare to any similarly situated white juror, the history of the use of peremptory challenges in jury selection in that county, and the fact that, at the time that the State challenged juror McNeill, the State had used eight of its eleven peremptory challenges against black potential jurors. At the same point in time, the State had used two of its peremptory challenges against white potential jurors. Similarly, the State had passed twenty out

---

[1] The three prospective jurors at issue are Brian Humphrey, Robert Layden, and William McNeill.

> of twenty-two white potential jurors while passing only
> eight out of sixteen black potential jurors.

*Id*. at 360, 841 S.E.2d at 503.[2] In accordance with this Court's instructions, the trial court on remand conducted a hearing and made extensive findings of fact under step three of *Batson* and concluded there was no *Batson* violation. We must now determine whether the trial court's conclusions are clearly erroneous.

## II. Analysis

The ability to serve on a jury is one of "the most substantial opportunit[ies] that most citizens have to participate in the democratic process." *Flowers v. Mississippi*, 139 S. Ct. 2228, 2238 (2019) (citing *Powers v. Ohio*, 499 U.S. 400, 407, 111 S. Ct. 1364, 1369 (1991)). The right to jury service is protected by the Equal Protection Clause of the Federal Constitution and Article I, Section 26 of the North Carolina Constitution. In jury trials, however, attorneys are given the right to excuse a certain number of prospective jurors through discretionary strikes known as peremptory strikes. "Peremptory strikes have very old credentials and can be traced

---

[2] While the Court specifically referenced juror McNeill in its remand instructions, it appears the trial court was required to conduct the same analysis for all three excused prospective jurors. *See id*. at 347, 841 S.E.2d at 496 (holding "[a]s to all three jurors, we remand for reconsideration of the third stage of the *Batson* analysis, namely whether [defendant] proved purposeful discrimination in each case.").

The dissent in *Hobbs I* would not even have reached steps two or three of *Batson* because the trial court's findings were not clearly erroneous. *Id*. at 361, 841 S.E.2d at 504 (Newby, J., dissenting). Moreover, the dissent emphasized the majority's failure to apply the correct deferential standard of review. *Id*. at 368, 841 S.E.2d at 509. In failing to apply the correct deferential standard of review, the dissent argued that the majority made "arguments not presented to the trial court or the Court of Appeals and then fault[ed] both courts for not specifically addressing them." *Id*. at 361, 841 S.E.2d at 504.

back to the common law." *Id*. Notably, "peremptory strikes traditionally may be used to remove any potential juror for any reason—no questions asked." *Id*.

The Equal Protection Clause prevents purposeful discrimination against a protected class, however, and thus it can limit an attorney's ability to exercise peremptory strikes. *See id*. Accordingly, the Supreme Court of the United States has recognized limitations on peremptory strikes to ensure that strikes are not used for a discriminatory purpose against a protected class. *See Batson*, 476 U.S. 79, 106 S. Ct. 1712. In *Batson*, the Supreme Court of the United States set forth a three-prong test to determine whether a prosecutor improperly excused a prospective juror based on the juror's race. *See id*. This Court expressly "adopted the *Batson* test for review of peremptory challenges under the North Carolina Constitution." *State v. Fair*, 354 N.C. 131, 140, 557 S.E.2d 500, 509 (2001) (citing *State v. Lawrence*, 352 N.C. 1, 13, 530 S.E.2d 807, 815 (2000), *cert. denied*, 531 U.S. 1083, 121 S. Ct. 789 (2001)). Under the *Batson* framework, the defendant must first present a prima facie showing of purposeful discrimination. *Batson*, 476 U.S. at 93–94, 106 S. Ct. at 1721. Second, if the trial court finds that the defendant has presented a prima facie showing of purposeful discrimination, the burden then shifts to the State to provide race-neutral reasons for its peremptory strike. *Id*. at 97, 106 S. Ct. at 1723. Third, the trial court then determines whether the defendant, who has the burden of proof, established that the prosecutor acted with purposeful discrimination. *Id*. at 98, 106 S. Ct. at 1724.

On appeal, "[t]he trial court's ruling will be sustained 'unless it is clearly erroneous.'" *State v. Waring*, 364 N.C. 443, 475, 701 S.E.2d 615, 636 (2010) (quoting *Snyder v. Louisiana*, 552 U.S. 472, 477, 128 S. Ct. 1203, 1207 (2008)). In other words, this Court conducts an "independent examination of the record," *Foster v. Chapman*, 578 U.S. 488, 502, 136 S. Ct. 1737, 1749 (2016), and will uphold the trial court's conclusions unless this Court, upon reviewing "the entire evidence," is "left with the definite and firm conviction that a mistake ha[d] been committed," *Hernandez v. New York*, 500 U.S. 352, 369, 111 S. Ct. 1859, 1871 (1991) (alteration in original) (quoting *United States v. U. S. Gypsum Co.*, 333 U.S. 364, 395, 68 S. Ct. 525, 542 (1948)). Moreover, "[w]here there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." *State v. Thomas*, 329 N.C. 423, 433, 407 S.E.2d 141, 148 (1991) (quoting *Anderson v. Bessemer City*, 470 U.S. 564, 574, 105 S. Ct. 1504, 1511 (1985)).

Because this Court's decision in *Hobbs I* ordered the trial court to conduct further proceedings solely under the third step of *Batson*, we address only the third step here.

## A. Step Three of *Batson*

In reviewing the trial court's decision as to the third step of *Batson*, this Court has previously stated factors to consider in determining whether the trial court's conclusions of law are clearly erroneous. *See Golphin*, 352 N.C. at 427, 533 S.E.2d at 211. These factors include the race of the witnesses, the prosecutor's questions during

voir dire, whether the State exhausted all of its peremptory strikes, whether the State accepted any black jurors, and whether the case is susceptible to racial discrimination. *Id.* The ultimate determination under step three, however, is whether the prosecutor's peremptory strike was "motivated in substantial part by discriminatory intent." *Snyder*, 552 U.S. at 485, 128 S. Ct. at 1212. This determination "involves an evaluation of the prosecutor's credibility." *Id.* at 477, 128 S. Ct. at 1208. In assessing the prosecutor's credibility, "the best evidence [of discriminatory intent] often will be the [prosecutor's] demeanor." *Hernandez*, 500 U.S. at 365, 111 S. Ct. at 1869. Notably, the trial court is in the best position to assess prosecutor credibility and demeanor.

Thus, because "[t]he trial court has the ultimate responsibility of determining 'whether the defendant has satisfied his burden of proving purposeful discrimination[,]' " this Court will "give [the trial court's] determination 'great deference,' overturning it only if it is clearly erroneous." *Hobbs I*, 374 N.C. at 349, 841 S.E.2d at 497 (quoting *Golphin*, 352 N.C. at 427, 533 S.E.2d at 211).

In *Hobbs I*, this Court remanded to the trial court and instructed it to conduct a hearing and make findings of fact based on "the evidence in its totality." *Id.* at 360, 841 S.E.2d at 503. Specifically, this Court ordered the trial court to consider whether the State's reasons for its strikes were pretextual, the history of peremptory strikes in that county, the comparison between the three excused jurors and any similarly situated white prospective jurors, and the statistical comparison between the State's

number of peremptory strikes used on white jurors versus black jurors. *Id.* On remand, the trial court conducted a hearing and made extensive findings of fact in accordance with this Court's directive in *Hobbs I*. Based on those findings, the trial court concluded there was no *Batson* violation as to any of the three prospective jurors. After reviewing the trial court's findings of fact and conducting our own independent review of the record, we determine that the trial court's conclusions are not clearly erroneous.

## B. Trial Court's Findings of Fact

As instructed by this Court, the trial court considered numerous factors under the third step of *Batson* as to all three prospective jurors at issue, including: the races of defendant, the victim, and the key witnesses; whether the case was susceptible to racial discrimination; whether the State asked questions or made statements tending to support an inference of discrimination; whether the State disparately questioned jurors; a comparison of questions and juror answers; whether the State had a pattern of using peremptory strikes against black jurors; whether the State accepted any black jurors; and whether the State's reasons for striking the prospective jurors were pretextual.

The trial court first found that defendant is black and the victim in this case is white, while some of the key witnesses are black. Additionally, the trial court found the race of the victim in the Rule 404(b) evidence that was presented at trial was black. Next, the trial court found this case was not susceptible to racial discrimination

because there was no evidence that defendant's race, the victim's race, or the witnesses' races were "in any way significant before or during the trial." Additionally, the trial court found the State did not ask questions or make statements that support a finding of discrimination. Instead, the trial court found "that as to each of the three excused jurors, the State asked questions [and made statements] in an even-handed manner," which mitigated against a finding of purposeful discrimination. In a similar context, the trial court found that the State did not disparately question the black jurors as compared to the white jurors. Instead, the trial court found "that the only significant differences in the questioning was a function of the different styles of three prosecutors engaged in the jury selection process."

Moreover, the trial court considered the history of prosecutors' use of peremptory strikes in the jurisdiction and found this history did not support a finding of purposeful discrimination. In particular, the trial court found defendant's reliance on a study conducted by researchers at Michigan State University (MSU) regarding North Carolina prosecutors' use of peremptory strikes to be misleading. First, while the study showed a higher percentage of strikes against black jurors, all of the *Batson* claims in each of the cases mentioned in the study had been rejected by our state's appellate courts. Second, the trial court found that the MSU study was potentially flawed in three ways: (1) the study identified juror characteristics without input from prosecutors, thus failing to reflect how prosecutors evaluate various characteristics; (2) recent law school graduates with little to no experience in jury selection evaluated

the juror characteristics; and (3) the recent law school graduates conducted their study solely based on trial transcripts rather than assessing juror demeanor and credibility in person. Notably, however, the trial court found that even assuming the relevant history supports a finding of discrimination, "the probative value of the inference is significantly reduced by the fact that the prosecutors in this case were not the prosecutors in any of the cases identified by the historical evidence."

Additionally, the trial court conducted side-by-side juror comparisons of the three excused prospective jurors at issue with similarly situated prospective white jurors whom the State did not strike. The trial court declined to adopt defendant's suggested "single factor approach" to compare the prospective jurors because that approach fails to consider each juror's characteristics "as a totality." Instead, the trial court adopted the State's "whole juror" approach in its comparisons. *See Flowers*, 139 S. Ct. at 2246 (stating that the Court looks at the "overall record" of a *Batson* case and makes a determination "[i]n light of all of the circumstances"). It found that this approach "provided the State with the complete image or picture of the juror[,] thereby informing its decision as to whether the juror was either appropriate or inappropriate for this specific case." Importantly, however, the trial court found that even if the juror comparisons supported a finding of discrimination, the totality of the remaining circumstances outweighed the probative value of these comparisons. After reviewing the entire evidence, we agree that the evidence supports the trial court's findings of fact.

### 1. **Brian Humphrey**

The trial court first considered whether defendant proved purposeful discrimination in the State's strike of prospective juror Brian Humphrey. To reach its conclusion, the trial court made extensive findings of fact based on the totality of the evidence in the record. Specifically, the trial court compared Humphrey's responses to the State's questions with the responses of prospective jurors James Stephens and Sharon Hardin. In each comparison, the trial court found the differences between the two prospective jurors' responses outweighed the similarities. After considering the relevant factors and conducting a thorough comparative juror analysis, the trial court concluded that defendant failed to prove the State acted with purposeful discrimination in peremptorily striking Humphrey. Accordingly, the trial court ruled there was no *Batson* violation. After conducting our own independent review of the record, we agree with the trial court's findings.

In comparing prospective juror Stephens to Humphrey, the trial court found that although defendant alleged that Stephens "answered similarly to excused juror Humphrey regarding suffering depression and being uncomfortable with the death penalty," there are significant differences between the two prospective jurors' experiences. For instance, Stephens's battle with depression ended in 1986, whereas Humphrey was currently employed in the mental health field. Humphrey's current involvement with mental health professionals was notable because "[d]efendant planned to rely heavily on the testimony of mental health providers in his defense,"

thus indicating a risk that Humphrey may be partial to those witnesses. Second, Stephens's alleged comfort issues regarding the death penalty only arose during defense questioning. Ultimately, however, Stephens preferred imposing the death penalty over life imprisonment without parole. Indeed, in response to defense counsel questioning him on the death penalty, Stephens stated, "I have said that I have a leaning toward the death penalty in a case as being the appropriate sentence in the case of conviction of first-degree murder." Humphrey, on the other hand, expressed difficulty on the issue, stating that he is "not a killer."

In the next comparison, the trial court found that although defendant alleged that Hardin answered similarly to Humphrey regarding the death penalty and similar experiences working with young people, the differences between the two were significant. First, Hardin expressed no reservations about voting for the death penalty, while Humphrey expressed hesitation and sympathy for defendant. The record shows Hardin expressly stated she "would not have a problem" with considering the death penalty. Humphrey, however, expressly stated he would "be kind of hesitant" to vote for the death penalty. Second, Hardin worked with the youth in her church whereas Humphrey served in group homes helping individuals facing criminal charges and suffering from mental health issues. This distinction is important because Humphrey's involvement in group homes may cause him to identify with defendant's background.

In addition to the comparative juror analysis, the trial court found that the State did not use all of its peremptory strikes and accepted 45% of black prospective jurors after striking Humphrey. The trial court found that both of these factors mitigated against a finding of racial discrimination. The trial court similarly determined that the State's reasoning was not pretextual, which further negated a finding of purposeful racial discrimination.

Accordingly, the trial court concluded that because defendant failed to prove the State acted with purposeful discrimination in striking prospective juror Humphrey, there was no *Batson* violation. The trial court's findings of fact and our own examination of the record support this conclusion. Thus, the trial court's decision regarding prospective juror Humphrey is not clearly erroneous.

### 2. Robert Layden

Next, the trial court concluded that defendant failed to prove that the State acted with purposeful discrimination in peremptorily striking prospective juror Robert Layden, and thus there was no *Batson* violation. In reaching this conclusion, the trial court made extensive findings of fact based on the entire evidence in the record. These findings include a side-by-side juror comparison between Layden and similarly situated white prospective jurors whom the State did not strike. Specifically, the trial court compared Layden's responses to the responses of prospective jurors James Elmore, James Stephens, and Johnny Chavis. In each comparison, the trial court found that the differences between the prospective jurors'

responses and experiences outweighed any similarities. After conducting our own independent review of the record, we agree with the trial court's findings.

In comparing Elmore and Layden, the trial court found that although defendant alleged that Elmore "answered similarly to excused juror Layden regarding alleged concerns about the death penalty, having an alleged criminal record, and having family members with alcohol problems," there were significant differences between the two prospective jurors' experiences. First, Elmore did not express hesitation about the death penalty, while Layden "had clear hesitations." Indeed, the voir dire transcript reflects that Layden stated that "every human being should have reservations" but that he would have to put his personal feelings aside. On the other hand, Elmore stated he would not "have any reservations" about voting for the death penalty. Second, Elmore's criminal record consisted of various traffic incidents that did not require a court appearance, whereas Layden refused to discuss his breaking and entering conviction. Finally, while Elmore had family members with substance abuse issues, Layden served as a "father figure" to individuals with substance abuse issues and expressed his belief in giving people second chances. Layden's personal involvement in mentoring these individuals and his personal beliefs raised the risk that he would improperly sympathize with defendant.

The trial court's findings similarly emphasized the differences between prospective jurors Stephens and Layden. First, Stephens suffered from depression that ended in 1986, whereas Layden's sister, with whom he had a close relationship,

was currently experiencing similar symptoms to those alleged by defendant. Again, similar to the concern with Humphrey, Layden's relationship with his sister may have caused him to give more credibility to the mental health providers on whom defendant relied at trial. Second, Stephens did not know anyone close to him with substance abuse issues, while Layden mentored individuals with substance abuse issues and supported giving them a second chance. Again, this fact raised the concern that Layden would improperly sympathize with defendant. Finally, Stephens expressly preferred the death penalty over life imprisonment without parole, whereas Layden clearly hesitated on the subject. The record reflects the following exchange between the prosecutor and Layden:

> [PROSECUTOR]: So, if you thought the death penalty was the appropriate punishment after going through the four-step process, then you yourself could vote for it?
>
> [LAYDEN]: Unfortunately I would have to.
>
> . . .
>
> [PROSECUTOR]: Okay. Any hesitations or reservations about either one of them?
>
> [LAYDEN]: I think every human being should have reservations, especially about having someone's life taken
> . . . .

Furthermore, the trial court's findings highlighted key differences between Chavis and Layden despite some similar answers regarding substance abuse and criminal records. First, Chavis had no reservations about the death penalty, whereas

Layden had clear reservations. The record reflects that Chavis stated he had been in favor of the death penalty since he "was old enough to be held accountable for [his] decisions." Layden, on the other hand, expressly stated he would have to "put [his] personal feelings aside and try to follow the letter of the law," and he believed that "every human being should have reservations" about the death penalty. Second, while Chavis had family members with substance abuse issues, he did not mentor those struggling with substance abuse issues as Layden did, and thus there was no clear risk that Chavis would improperly sympathize with defendant. Finally, Chavis willingly disclosed his failure to appear charge on his criminal record, while Layden "did not want to discuss" his breaking and entering conviction.

In addition to the comparative juror analysis, the trial court found that the State's 45% acceptance rate of black jurors after the State excused Layden did not support a finding of purposeful racial discrimination. Moreover, the trial court found that the State's proffered reasons for striking Layden were not pretextual, and the history of the State's use of peremptory strikes in the jurisdiction was not persuasive.

Based on these findings, the trial court determined that defendant failed to prove the State acted with purposeful discrimination in striking prospective juror Layden. Therefore, the trial court concluded there was no *Batson* violation. This conclusion is supported by the trial court's findings as well as our own independent review of the entire record. Thus, the trial court's conclusions regarding prospective juror Layden are not clearly erroneous.

### 3. *William McNeill*

In its final juror comparison, the trial court similarly determined that defendant failed to prove the State acted with purposeful discrimination in peremptorily striking prospective juror William McNeill. Therefore, the trial court concluded there was no *Batson* violation. Based on our own review of the record, the trial court's conclusion is supported by its findings of fact. In making its findings, the trial court considered the relevant factors and conducted a side-by-side juror comparison between McNeill and similarly situated white prospective jurors whom the State did not strike. Specifically, the trial court compared McNeill's responses to the State's questions to prospective jurors James Stephens, Sharon Hardin, Amber Williams, Johnny Chavis, Vickie Cook, and James Elmore. Again, in each comparison, the trial court found that the differences between the two prospective jurors' answers and experiences outweighed any similarities. After conducting our own independent examination of the record, we agree with the trial court's findings.

In comparing Stephens and McNeill, the trial court found that although defendant alleged that the two prospective jurors "answered similarly . . . regarding suffering depression, knowledge of people with substance abuse issues, ministry work, and being uncomfortable with the death penalty," it ultimately found that the differences outweighed the similarities. For instance, the trial court first noted that Stephens suffered from depression that ended over thirty-five years prior, whereas McNeill had a sister with current mental health issues that required his parents to

care for her. Like Layden, McNeill's relationship with his sister may have caused him to give more credibility to defendant's mental health witnesses. Second, Stephens did not know anyone close to him with substance abuse issues, while McNeill's father and uncle both drank heavily. This difference is notable because McNeill's experiences may have caused him to improperly sympathize with defendant. Third, Stephens participated in ministry work in assisted living facilities, whereas McNeill participated in outreach in "drug-infested areas." Again, this difference implies that McNeill may be inclined to sympathize with defendant. Finally, Stephens expressed that he preferred the death penalty over life imprisonment without parole, while McNeill preferred life imprisonment without parole over the death penalty. Indeed, the record reflects that McNeill stated he had "some feelings about the death penalty," and he was "not for the death penalty."

The trial court similarly noted the differences between prospective jurors Hardin and McNeill despite Hardin's similar "alleged concerns about the death penalty, working with youth in her church, and her brother's substance abuse issues." First, Hardin had no reservations about the death penalty, while McNeill preferred life imprisonment without parole. Again, the record shows McNeill expressly stated he was "not for the death penalty," whereas Hardin "would not have a problem" with voting for the death penalty. Second, Hardin mentored the youth at her church, whereas McNeill helped people in "drug-infested areas." This fact raised the risk that McNeill would improperly sympathize with defendant. Finally, both Hardin and

McNeill had family members who suffered from substance abuse issues. The trial court found, however, that Hardin herself did not have any such issues but McNeill, on the other hand, mentioned prior "sensitive issues with being 'in the streets too, going out to clubs and stuff.' "

Further, the trial court distinguished prospective juror Williams from McNeill. Although defendant alleged that their answers regarding mental health and substance abuse were similar, the trial court found that the notable differences between the two prospective jurors outweighed the similarities. First, Williams was the victim of an armed robbery at a convenience store, a crime similar to the crime committed by defendant. The trial court thus noted that Williams's previous experience made it "more likely that she would identify with the Victims" in defendant's case. Second, Williams expressed no reservations about the death penalty, whereas McNeill preferred life imprisonment without parole. Our review of the evidence shows Williams unequivocally agreed she could consider and vote for the death penalty, whereas McNeill expressly stated he was "not for the death penalty."

The trial court next found that although defendant alleged that prospective jurors Chavis and McNeill had some similarities, there were significant differences between the two. First, Chavis did not express hesitation regarding the death penalty, while McNeill clearly hesitated. Indeed, our examination of the record shows Chavis stated he believed "a person[ has] to be held [accountable] for their actions," and he agreed he could consider and vote for the death penalty. Second, while Chavis

had family members who suffered from mental health and substance abuse issues like McNeill's family members, the trial court found Chavis himself did not have these issues, whereas McNeill had a previous "lifestyle . . . in the streets [and] going out to clubs and stuff." This distinction suggests that McNeill was more likely to give credibility to defendant's mental health witnesses because of his personal experience.

The trial court similarly distinguished prospective juror Cook from McNeill. First, Cook expressed no hesitation about the death penalty while McNeill expressed a preference for life imprisonment without parole. The record reflects Cook answered definitively that she could consider and vote for the death penalty, whereas McNeill expressly stated he was "not for the death penalty." Second, while Cook's parents suffered from mental health and substance abuse issues, the trial court found she did not have a similar experience as McNeill with his previous "lifestyle."

Lastly, the trial court found that the differences between prospective jurors Elmore and McNeill outweighed the similarities. First, Elmore had no concerns about imposing the death penalty, whereas McNeill preferred life imprisonment without parole. Our review of the record reveals Elmore explicitly stated he would not "have any reservations" about voting for the death penalty. Second, Elmore stated that he was not close with his sister who suffered from substance abuse issues and did not share her lifestyle, while McNeill had a previous "lifestyle . . . in the streets [and] going out to clubs and stuff." Accordingly, Elmore did not seem to possess personal

experiences that might cause him to give undue credibility to defendant's mental health witnesses.

In addition to the extensive comparative juror analysis, the trial court found that the State's acceptance rate of black jurors was 50% after the State excused McNeill, which did not support a finding of purposeful discrimination. Moreover, as previously explained, the trial court found that the relevant history of the State's peremptory strikes in the jurisdiction was flawed and therefore misleading. Finally, the trial court found the State's reasoning for striking McNeill was not pretextual.

Based on these findings, the trial court concluded that defendant failed to prove the State acted with purposeful discrimination in striking prospective juror McNeill, and thus there was no *Batson* violation. The trial court's findings of fact, as well as our own independent review of the record, support the trial court's conclusions. Thus, the trial court's conclusions regarding prospective juror McNeill are not clearly erroneous.

### III.    Conclusion

The trial court is in the best position to weigh credibility and assess the demeanor of both the prosecutor and the prospective jurors. Here the trial court fully complied with this Court's remand instructions in *Hobbs I* by extensively "considering the evidence in its totality" and making findings of fact based on that evidence. *Hobbs I*, 374 N.C. at 360, 841 S.E.2d at 503. After carefully weighing the evidence, the trial court concluded that defendant had failed to prove there was a *Batson* violation under

step three of the analysis. Applying the proper deferential standard of review, the trial court's conclusions are supported by its findings of fact. Additionally, our independent examination of the entire evidence supports the trial court's findings and conclusions. Thus, the trial court's order on remand is not clearly erroneous. The decision of the trial court is affirmed.

AFFIRMED.

Justices BERGER and DIETZ did not participate in the consideration or decision of this case.

Justice EARLS dissenting.

This case involves the State's use of peremptory challenges to strike three Black prospective jurors, Brian Humphrey, Robert Layden, and William McNeill, during Mr. Hobbs's 2014 capital murder trial. While Mr. Hobbs objected to the State's use of peremptory challenges under *Batson v. Kentucky*, 476 U.S. 79 (1986), the trial court denied those objections, and the Court of Appeals found no error. *See State v. Hobbs*, 260 N.C. App. 394, 409 (2018). This Court allowed Mr. Hobbs's petition for discretionary review and subsequently held that the Court of Appeals had erred as a matter of law in deciding Mr. Hobbs's *Batson* claim. *State v. Hobbs* (*Hobbs I*), 374 N.C. 345, 360 (2020). The case was remanded to the trial court with instructions on the proper application of *Batson*. *Id.* On remand, Judge Frank Floyd, the same judge who conducted Mr. Hobbs's 2014 trial, denied Mr. Hobbs's *Batson* challenge.

In *Batson,* the United States Supreme Court held that while peremptory challenges are permissible for almost any reason, "a State may not discriminate on the basis of race when exercising peremptory challenges against prospective jurors in a criminal trial." *Flowers v. Mississippi*, 139 S. Ct. 2228, 2234 (2019) (citing *Batson*, 476 U.S. 79). This is in part because "[e]qual justice under law requires a criminal trial free of racial discrimination in the jury selection process." *Id.* at 2242. Indeed, "racial discrimination in the selection of jurors casts doubt on the integrity of the judicial process and places the fairness of a criminal proceeding in doubt." *Powers v.*

*Ohio*, 499 U.S. 400, 411 (1991) (cleaned up). Furthermore, "[t]he Fourteenth Amendment[ ] mandate[s] that race discrimination be eliminated from all official acts and proceedings of the State." *Id.* at 415; *see also* N.C. Const. art. I, § 19 ("No person shall be denied the equal protection of the laws; nor shall any person be subjected to discrimination by the State because of race, color, religion, or national origin.").

Although trial judges have the primary responsibility of enforcing *Batson*, on appeal this Court is required to review the same factors the trial court did and determine whether the trial court's ruling was clearly erroneous. *Flowers*, 139 S. Ct. at 2243–44. In doing so, this Court must consider whether "all of the relevant facts and circumstances taken together establish that the trial court committed clear error in concluding that the State's peremptory strike of [a] black prospective juror . . . was not 'motivated in substantial part by discriminatory intent.' "[1] *Id.* at 2235 (quoting *Foster v. Chatman*, 578 U.S. 488, 513 (2016)). Despite evidence to the contrary, and through a misapplication of *Batson* and its progeny, the majority holds that the trial court's order is not clearly erroneous. Because the evidence Mr. Hobbs presented supports a finding of racial discrimination in his trial's jury selection process and because the trial court misapplied the *Batson* standard, I dissent.

---

[1] It is important to note that the reason for the State's use of a peremptory challenge need not be based "solely" on discriminatory intent. Instead, as we explained in *State v. Waring*, 364 N.C. 443, 480 (2010), and reiterated in *Hobbs I*, "the third step in a *Batson* analysis is the less stringent question [of] whether the defendant has shown 'race was *significant* in determining who was challenged and who was not.' " *State v. Hobbs* (*Hobbs I*), 374 N.C. 345, 352 n.2 (2020) (quoting *Waring*, 364 N.C. at 480).

## I.    The *Batson* Standard

Under *Batson*, a trial judge must consider "all relevant" evidence a defendant presents that raises an inference of discrimination. *Hobbs I*, 374 N.C. at 356 (quoting *Flowers*, 139 S. Ct. at 2245). This duty requires a trial judge to "appropriately" consider "all of the evidence," conduct a "meaningful" analysis of it, and "explain how it weighed" that evidence. *Id.* at 356, 358–59. In *Flowers*, the United States Supreme Court provided a non-exhaustive list of evidence a defendant may present to support a *Batson* challenge, including:

> • statistical evidence about the prosecutor's use of peremptory strikes against black prospective jurors as compared to white prospective jurors in the case;
>
> • evidence of a prosecutor's disparate questioning and investigation of black and white prospective jurors in the case;
>
> • side-by-side comparisons of black prospective jurors who were struck and white prospective jurors who were not struck in the case;
>
> • a prosecutor's misrepresentations of the record when defending the strikes during the *Batson* hearing;
>
> • relevant history of the State's peremptory strikes in past cases; or
>
> • other relevant circumstances that bear upon the issue of racial discrimination.

139 S. Ct. at 2243. Accordingly, in *Hobbs I*, this Court indicated that a trial court must "consider[ ] the evidence [presented] in its totality," compare the responses of the challenged juror to "any similarly situated white juror," and consider historical

evidence of the use of peremptory challenges in jury selection in that county, as well as any statistics detailing the prosecution's strike pattern in that particular case. *Hobbs I*, 374 N.C. at 360. At the same time, this Court emphasized that by "[f]ailing to apply the correct legal standard," the trial court had inadequately considered the evidence Mr. Hobbs had presented. *Id.* Despite having delineated these requirements, the trial court has failed again to adequately consider all the evidence Mr. Hobbs presented.

## II.   Susceptibility to Racial Discrimination

First, the trial court's conclusion that Mr. Hobbs's case was not susceptible to racial discrimination was a clearly erroneous factual finding.  In *State v. Tirado*, 358 N.C. 551 (2004), this Court held that "susceptibility of the particular case to racial discrimination" is a relevant factor to consider at the third step of the *Batson* analysis. *Id.* at 569–70 (quoting *State v. Golphin*, 352 N.C. 364, 427 (2000)). The Supreme Court has also acknowledged that it "remains an unfortunate fact in our society that violent crimes perpetrated against members of other racial or ethnic groups often raise [the] possibility" of racial prejudice. *Rosales-Lopez v. United States*, 451 U.S. 182, 192 (1981). Similarly, in *State v. Golphin*, this Court explained that a case "may be . . . susceptible to racial discrimination [when] defendants are African-Americans and the victims were Caucasian." 352 N.C. at 432 (citing *State v. White*, 349 N.C. 535, 548–49 (1998)).

In the present case, defendant, Mr. Hobbs, is Black, while four of his victims are white. But rather than focus on these facts, the trial court focused on (1) the race of the victim based on the evidence the State presented under Rule 404(b) of the North Carolina Rules of Evidence, which was Black, *see* N.C.G.S. § 8C-1, Rule 404(b) (2021); and (2) the race of "key witnesses, some of whom [the court found] to be [B]lack." In doing so, the trial court determined that this "particular case . . . was [not] susceptible to racial discrimination." The trial court also concluded that "the race of the Defendant, the Victim[s], . . . or any of the witnesses was [not] in any way significant before or during the trial of this matter."

While a trial court is permitted to consider the races of witnesses in the case, *see White,* 349 N.C. at 548, it does not necessarily follow that every case involving a Black defendant and a Black witness or a Black victim will lead a trial court to conclude the case is not susceptible to racial discrimination. Although that was the conclusion in *White,* the circumstances here are quite different. Mr. Hobbs's case involves a Black defendant and multiple white victims. As noted above, cases involving interracial violence are particularly susceptible to racial discrimination. *See Rosales-Lopez,* 451 U.S. at 192.

In reaching its conclusion, the trial court ignored our own Court's precedent as well as Supreme Court precedent.[2] *See, e.g., White,* 349 N.C. at 550; *Rosales-Lopez,*

---

[2] *See also Flowers v. Mississippi,* 139 S. Ct. 2228, 2274 (2019) (Thomas, J., dissenting) ("The Court knows these prejudices exist. Why else would it say that 'a capital defendant

451 U.S. at 192. It also discounted pertinent facts in this case, namely Mr. Hobbs's race, his victims' races, and the fact that he was being tried capitally for crimes against victims who were a different race than him. Taking this information together, the trial court should have found Mr. Hobbs's case was susceptible to racial discrimination. Accordingly, it was clear error for the trial court to find otherwise.

### III.    The Michigan State University (MSU) Study

Next, the trial court committed clear error in its findings relating to the Michigan State University (MSU) study. This Court as well as the United States Supreme Court has previously said that to establish a *Batson* violation, defendants may present "relevant history of the State's peremptory strikes in past cases." *Hobbs I*, 374 N.C. at 351 (quoting *Flowers*, 139 S. Ct. at 2243); *see also Miller-El v. Cockrell* (*Miller-El I*), 537 U.S. 322, 346 (2003). In *Hobbs I*, this Court also explained that "a [trial] court must consider historical evidence of discrimination in a jurisdiction." *Hobbs I*, 374 N.C. at 351. Accordingly, Mr. Hobbs presented evidence from a study by scholars at MSU, who reviewed data in Cumberland County from 1990 to 2010. Catherine M. Grosso & Barbara O'Brien, *A Stubborn Legacy: The Overwhelming Importance of Race in Jury Selection in 173 Post-Batson North Carolina Capital Trials*, 97 Iowa L. Rev. 1531 (2012). According to two professors who led the MSU study, this data showed that "prosecutors in 11 cases struck qualified black venire

_____

accused of an interracial crime is entitled to have prospective jurors informed of the race of the victim and questioned on the issue of racial bias'?").

members at an average rate of 52.3% but struck qualified non-black venire members at an average rate of only 20.8%." This data also showed that in Cumberland County, the State was "2.5 times more likely to strike qualified venire members who were black" and that "[t]his difference in strike levels [was] significant."

Despite being confronted with statistical evidence showing a disparate pattern of peremptory strikes against Black venire members in Cumberland County, the trial court chose to discount the study as "potentially flawed." Additionally, the trial court determined that the study "[did] not tend to support an inference of racial discrimination . . . [by] the State in this case." To support its conclusion that the study was "potentially flawed," the trial court cited to the trial transcript in *State v. Robinson*, 375 N.C. 173 (2020). However, the court failed to acknowledge the trial court's findings in that case, namely that the "MSU study [was] a valid, highly reliable, statistical study." Furthermore, the *Robinson* trial court determined the study showed that "race [was] highly correlated with strike decisions in North Carolina."

Additionally, the trial court criticized the MSU study for employing "unqualified" recent law school graduates to conduct the study. While the trial court characterized recent law school graduates as "unqualified," the United States Supreme Court has cited studies on racial disparities in jury strikes in which law students were research assistants. *See, e.g., Miller-El v. Dretke* (*Miller-El II*), 545 U.S. 231, 268 (2005) (Breyer, J., concurring) (citing David C. Baldus et al., *The Use of*

*Peremptory Challenges in Capital Murder Trials: A Legal and Empirical Analysis*, 3 U. Pa. J. Const. L. 3, 3 (2000) ("The authors gratefully acknowledge the expert research assistance of Iowa law students . . . .")). Furthermore, the use of recent law school graduates as law clerks and research assistants in this Court and others across the country severely undercuts the trial court's conclusion that recent law school graduates are unqualified.

The trial court was also misguided in disregarding the MSU study because it was based on "cold trial transcripts." As all appellate review is conducted in this manner, this criticism is without merit. *See Cutter v. Wilkinson*, 544 U.S. 709, 718 n.7 (2005) ("[W]e are a court of review, not of first view."). Indeed, the Supreme Court has decided our nation's most critical cases on a "cold" record. Yet under the trial court's logic, this Court would have to question not only our own past cases but also those decided by any other appellate court.

Moreover, the trial court disregarded the MSU study because the prosecutors in that study were not involved in Mr. Hobbs's case. However, this is a legal error. In *Miller-El I,* the United States Supreme Court addressed and rejected a similar argument. 537 U.S. at 347. There, the Court explained that historical evidence can be used to show "the culture of [a] District Attorney's Office in the past" and that this evidence is "relevant to the extent it casts doubt on the legitimacy of . . . the State's actions." *Id*. Specifically, the Court found it significant that the prosecutors in Miller-El's case were employed during the time the State had used racially discriminatory

tactics to exclude prospective jury members. *Id*. Indeed, the Court reasoned that "[e]ven if [it] presume[d] . . . that the prosecutors in Miller-El's case were not part of this culture of discrimination, the evidence suggest[ed] they were likely not ignorant of it." *Id*.

Similarly, in Mr. Hobbs's case, the MSU study provides evidence of the culture in the Cumberland County District Attorney's Office from 1990 to 2010. As noted above, the data indicates a disparate pattern of peremptory strikes, which supports the conclusion that a culture of discrimination existed in the Cumberland County District Attorney's Office. This "casts doubt on the legitimacy of the motives underlying the State's actions in [Mr. Hobbs's] case." *See Miller-El I*, 537 U.S. at 347. Furthermore, the prosecutors in Mr. Hobbs's case, Billy West, Robby Hicks, and Rita Cox, were employed in that office during previous administrations. Thus, just like in *Miller-El I*, the prosecutors in Mr. Hobbs's case were likely "not ignorant" of the culture of discrimination identified by the MSU study. *See id*. Accordingly, it was error for the trial court to disregard the MSU study.

IV.   **The State's Pattern of Peremptory Challenges in Mr. Hobbs's Case**

"[S]tatistical evidence about the prosecutor's use of peremptory strikes against black prospective jurors as compared to white prospective jurors in the case" can be used to support a *Batson* challenge. *Flowers*, 139 S. Ct. at 2243. In some cases, "the statistical evidence alone raises some debate as to whether the prosecution acted with a race-based reason when striking prospective jurors." *Miller-El I*, 537 U.S. at 342;

*see also Miller-El II*, 545 U.S. at 240–41 ("The numbers describing the prosecution's use of peremptories are remarkable.").

Similarly, to *Miller-El I* and *Miller-El II*, the statistics in Mr. Hobbs's case raise suspicion about whether the State struck prospective jurors Humphrey, Layden, and McNeill because of their races. When Mr. Hobbs raised his *Batson* challenge after Humphrey and Layden were struck, six of the State's first eight strikes (75%) were used against Black prospective jurors. The State had also struck six of eleven Black prospective jurors, resulting in a Black prospective juror acceptance rate of 45% and a Black prospective juror rejection rate of 55%. In contrast, the State had only struck two of twenty non-Black prospective jurors. This resulted in a non-Black prospective juror rejection rate of 10% and an acceptance rate of 90%.

At the time McNeill was struck, eight of the State's first eleven strikes (72%) had been used against Black prospective jurors. The State had also excused eight of sixteen Black prospective jurors, providing a Black prospective juror rejection rate of 50%. At the same time, the State had only challenged three of twenty-two non-Black prospective jurors, providing a non-Black prospective juror rejection rate of approximately 13%. Ultimately, the State's strike pattern caused a jury pool composed of roughly 50% Black and 50% non-Black prospective jurors, to become a jury of twelve that was 83% non-Black.

"Happenstance is unlikely to produce this disparity." *Miller-El II*, 545 U.S. at 240–41 (quoting *Miller-El I*, 537 U.S. at 342). Despite this, the trial court found that

the acceptance rate of Black prospective jurors "tend[ed] to negate an inference of discrimination and motivation." In doing so, the trial court failed to explain how a 45% acceptance rate and a 55% rejection rate for Black prospective jurors at the time Humphrey and Layden were struck is evidence against an inference of discrimination. Similarly, the trial court also did not explain how a 55% rejection rate of Black prospective jurors at the time of the Humphrey and Layden strikes could negate an inference of discrimination when compared to a 10% rejection rate for non-Black prospective jurors. The trial court repeated the same errors in reviewing the statistics at the time of the McNeill strike, failing to explain how the State's strike pattern removing 50% of Black prospective jurors but only 13% percent of non-Black prospective jurors could be evidence against a finding of discrimination.

Our decision in *Hobbs I* found error in part because the trial court did not "explain how it weighed the totality of the circumstances surrounding the prosecution's use of peremptory challenges." *Hobbs I*, 374 N.C at 358. The Court in *Hobbs I* also ordered the trial court to consider all the evidence "in its totality" to determine "whether the primary reason given by the State for challenging . . . McNeill [, Humphrey, and Layden] was pretextual." *Id*. at 360. However, a trial court cannot meet this standard by simply reciting statistics and concluding, without explaining, that those statistics "tend to negate an inference of discrimination and motivation."

## V.    Comparative Juror Analysis

More powerful than bare statistics are "side-by-side comparisons of some black venire panelists who were struck and white panelists allowed to serve." *Miller-El II*, 545 U.S. at 241. "Potential jurors do not need to be identical in every regard for this to be true." *Hobbs I*, 374 N.C. at 359. "If a prosecutor's proffered reason for striking a black panelist applies just as well to an otherwise-similar nonblack who is permitted to serve, that is evidence tending to prove purposeful discrimination . . . ." *Id.* (quoting *Miller-El II*, 545 U.S. at 241). At this step, "the critical question" relates to "the persuasiveness of the prosecutor's justification for his peremptory strike." *Miller-El I*, 537 U.S. at 338–39. "[I]mplausible or fantastic justifications may (and probably will) be found to be pretexts for purposeful discrimination." *Id.* (quoting *Purkett v. Elem*, 514 U.S. 765, 768 (1995)).

In this case, a comparative juror analysis shows that the State passed twenty-one non-Black prospective jurors who matched at least one of the reasons the State offered to support its strikes of Black prospective jurors. Many of the non-Black prospective jurors accepted by the State also shared more than one characteristic matching the excuses the State gave for striking Humphrey, Layden, and McNeill. The State's purported reasons for striking Humphrey, Layden, and McNeill fall into four categories: (1) death penalty reservations; (2) mental health connections; (3) substance abuse connections; and (4) criminal record. By providing these reasons, the

State asserts their dismissal of Humphrey, Layden, and McNeill was not based on race.

Specifically, the State purports to have struck McNeill because (1) he had "significant" reservations about imposing the death penalty, (2) he had "a sister with some anxiety issues," (3) he had family members with substance abuse problems, and (4) as a pastor, he had provided outreach "to folks . . . going through drugs and other difficult issues."

Next, the State contends it struck Layden because (1) "his sister had significant mental health issues," (2) he had some reservations about the death penalty, (3) he wanted to give soldiers who made "alcohol related or dumb mistakes" a "second chance," and (4) he had a prior arrest that he did not want to answer detailed questions about.

Lastly, the State asserts it struck Humphrey because (1) he had reservations about the death penalty, (2) he had connections to the mental health field and "thought [mental health professionals] did a good job," and (3) the State feared he would identify with Mr. Hobbs because Humphrey previously served as a mentor for people who had mental health issues and pending criminal charges. However, the reasons the State gave for striking Humphrey, Layden, and McNeill  also applied to non-Black prospective jurors the State passed.

## A. Death Penalty Reservations

First, the State asserts that Humphrey, Layden, and McNeill had reservations regarding the death penalty and expressed being hesitant to impose it. Specifically, McNeill noted that he "wouldn't say [he was] for the death penalty totally; but, [he could] understand the nature of the crime and—and make a fair—a fair decision based on the evidence." Layden stated he thought "every human being should have reservations, especially about having someone's life taken, . . . but those reservations [wouldn't] keep [him]" from following the court's instructions and that he could impose the death penalty if "the elements line[d] up." Lastly, in response to questioning about the death penalty, Humphrey noted he would "pray on it" and that he would "be kind of hesitant, but . . . wouldn't have no problem going through with it." Based on this information, neither Humphrey, Layden, nor McNeill would have had an issue imposing the death penalty. Yet, the State purported to have struck them based on this issue.

At the same time, the State passed four non-Black prospective jurors who expressed reservations about the death penalty. For example, when asked for his opinion about the death penalty, Antonio Flores stated, "I'm not crazy about it . . . I love life." Furthermore, James Elmore specifically told the State he had "some reservations about the death penalty," and James Stephens expressed being uncomfortable with the process. Additionally, Sharon Hardin noted she would probably be praying about the death penalty throughout the trial. Based on the

similarities between Humphrey's, Layden's, and McNeill's answers to those given by Flores, Elmore, Hardin, and Stephens, it is evident their answers do not reflect significant reservations about the death penalty. By excusing Humphrey, Layden, and McNeill for answers that were similar to those given by Flores, Elmore, Hardin, and Stephens, the State's choices illustrate that this rationale was a pretext.

## B. Mental Health Connections

Next, the State cited mental health connections as a reason for striking Humphrey, Layden, and McNeill. In doing so, the State speculated that these connections would make Humphrey, Layden, and McNeill more likely to credit the testimony of the defense's mental health experts. The State took issue with Layden having a sister with "significant mental health issues" and McNeill having a sister with anxiety issues and learning difficulties. Lastly, the State cited the fact that Humphrey worked in a mental health facility, had mentored people with mental health issues, and thought mental health professionals "did a good job" as a reason for its strike.

Yet, the State accepted eight non-Black prospective jurors with mental health connections. First, while the State purported to be concerned Humphrey, Layden, and McNeill would be more likely to credit the testimony of a mental health professional, it did not have the same concern when it came to non-Black jurors. For example, the State accepted prospective juror Stephens who specifically stated that, "if a person [was] presented to [him] as an expert [, he was] going to accept what they say pretty

much." Furthermore, Stephens had a second mental health connection, based on his own experience with mental health treatment and depression. The State also accepted Amber Williams who self-identified as having "severe anxiety and depression." Importantly, when asked if she could be fair and impartial and conduct her job as a juror, she responded, "I honestly don't know." Thus, not only were Stephens and Williams perhaps as likely, if not more likely, as Humphrey, Layden, and McNeill to identify with mental health professionals, Williams was also unsure if she could conduct her job as a juror. Despite this, the State struck Humphrey, Layden, and McNeill, while passing both of the non-Black prospective jurors.

Similarly to Layden and McNeill, six non-Black prospective jurors the State passed had family members with mental health concerns. For example, Johnny Chavis had a brother and sister who both required inpatient treatment and were diagnosed with posttraumatic stress disorder. Thus, non-Black prospective juror Chavis, despite having a stronger mental health connection than Black prospective jurors Layden and McNeill, was allowed to serve on the jury, but Layden and McNeill were not.

Moreover, one juror had a family member taking antidepressants, another juror had a nephew with bipolar disorder, and two jurors' family members had attempted suicide. If the State had truly been concerned about Humphrey's, Layden's, and McNeill's mental health connections, it would not have passed thirteen

non-Black prospective jurors with that same characteristic. Accordingly, this explanation is pretextual.

## C. Substance Abuse Connections

The State also cited substance abuse connections as a reason for striking Layden and McNeill; however, it passed fourteen non-Black prospective jurors who had connections to substance abuse. Specifically, the State took issue with McNeill having family members with substance abuse problems and that he and his family, in their work as pastors, had conducted outreach to people "going through drugs and other difficult issues." Furthermore, the State purports to have struck Layden because he wanted to give soldiers second chances when they made "alcohol related or dumb mistakes."

However, if McNeill's religious leadership was the true reason for his strike, then the State would not have accepted Sharon Hardin or James Stephens as jurors, both of whom held leadership positions in their church. Additionally, the State's concerns regarding Layden's and McNeill's familial or personal connections to people with substance abuse issues also fails when compared to the fourteen non-Black jurors the State passed who also had connections to substance abuse. Indeed, all fourteen of those jurors knew someone who had substance abuse issues, and thirteen of them identified a family member with drug or alcohol problems.

In some cases, the non-Black jurors the State passed reported having more than one family member with substance abuse concerns (e.g., Amber Williams,

Johnny Chavis, David Adams, and Richard Heins). In the end, the prospective jurors the State accepted had connections to substance abuse just as strong or stronger than Layden or McNeill. Accordingly, when comparing Layden's and McNeill's responses with those of similarly situated non-Black prospective jurors, the State's reasons for striking Layden and McNeill are pretextual.

## D. Criminal Record

The State also noted Layden's criminal record as a reason he was struck. At the same time, the State passed four non-Black prospective jurors who had criminal records. For example, James Carter had been arrested for several driving while impaired offenses and failed to disclose it during voir dire. Ronnie Trumble had been in jail for a driving while impaired offense, and Elmore had a few issues with speeding. Furthermore, at the time of the trial, Chavis had a pending shoplifting case and a failure to appear related to driving with a revoked license. Additionally, Chavis seemed hesitant to discuss the shoplifting charge and did not initially mention it during the prosecution's questioning.

## E. Non-Black Prospective Jurors who Shared More Than One Characteristic with Humphrey, Layden, and McNeill

Perhaps even more compelling is evidence that several of the prospective jurors passed by the State shared more than one of the characteristics the State gave as an excuse to strike Humphrey, Layden, and McNeill. For example, the record shows that Stephens gave very similar responses to those McNeill had given, yet he was seated as a juror, while McNeill was not. Specifically, Stephens was a minster who engaged

in outreach work while McNeill was a pastor who had also engaged in outreach work. Also, both Stephens and McNeill knew people with substance abuse issues. They also both had mental health connections; however, Stephens' connections were likely stronger than McNeill's because while McNeill had a family member with mental illness, Stephens had experienced it himself. Additionally, in regard to the death penalty, McNeill noted that he "wouldn't say [he was] for the death penalty totally; but, [he could] understand the nature of the crime and—and make a fair—a fair decision based on the evidence." Similarly, Stephens had expressed being "uncomfortable" with being on a jury that might impose the death penalty. Moreover, while the State speculated that McNeill might be more likely to credit the testimony of a mental health professional, Stephens actually expressed that he would. When McNeill's and Stephens' responses are compared, the only significant difference between the two men is that McNeill is Black and Stephens is not.

Regarding Layden, the record shows that seated non-Black prospective juror James Elmore gave answers similar to Layden's. Specifically, Elmore demonstrated caution about the death penalty, had a criminal history, and had several family members with substance abuse issues. Layden also had similar characteristics to non-Black prospective juror Stephens, who had mental health and substance abuse connections and explicitly mentioned being uncomfortable with the possibility of imposing the death penalty. Lastly, non-Black prospective juror Johnny Chavis had several family members with a history of mental health and substance abuse issues

and had a criminal record. Thus, while many non-Black prospective jurors shared characteristics with Layden, only Layden was struck.

Regarding Humphrey, the record shows that two of the State's reasons for striking him applied to at least two non-Black prospective jurors. Like Humphrey, non-Black prospective juror Stephens had mental health connections and expressed hesitancy about imposing the death penalty. Furthermore, non-Black prospective juror Hardin also shared two similarities with Humphrey. Namely, they both participated in mentorship roles and expressed that they wanted to pray about the death penalty.

Despite the similarities between the non-Black prospective jurors the State passed and Black prospective jurors Humphrey, Layden, and McNeill, the trial court determined that "the State's explanations for its challenge were [not] merely pretextual." But in conducting its comparative juror analysis, the trial court not only erred in its factual conclusion but also in its application of *Batson*. The question of whether the prosecution's reasons for striking a juror are pretextual is properly addressed during the third step of a *Batson* challenge. Here, the trial court appears to have misapplied the standard, concluding at step two of the analysis that the State's excuses were not "merely pretextual." This is incorrect.

Under *Batson*, step two only addresses "the facial validity of the prosecutor's explanation," *Hernandez v. New York*, 500 U.S. 352, 360 (1991), and it "does not demand an explanation that is persuasive, or even plausible," *Purkett v. Elem*, 514

U.S. 765, 767–68 (1995). This is in contrast to *Batson's* third step where "the persuasiveness of the justification becomes relevant" and "the trial court determines whether the opponent of the strike has carried his burden of proving purposeful discrimination." *Id*. at 768. Importantly, at the third step, "implausible or fantastic justifications may (and probably will) be found to be pretexts for purposeful discrimination." *Id*. Here, the trial court "erred by combining *Batson*'s second and third steps into one." *See id*. In doing so, the trial court foreclosed any meaningful analysis under step three. Indeed, having already decided at step two that the State's reasons for striking Humphrey, Layden, and McNeill were not "merely pretextual," the trial court had no reason to properly consider the comparative juror analysis.

Moreover, instead of focusing on the similarities between the Black stricken prospective jurors and the non-Black seated jurors, the trial court chose to focus on their differences. In doing so, it applied "the State's whole juror approach" and disregarded more than fifteen years of United States Supreme Court precedent. *See Miller-El II*, 545 U.S. at 241; *Snyder v. Louisiana*, 552 U.S. 472, 478–79 (2008); *Foster*, 578 U.S. at 505; *Flowers*, 139 S. Ct. at 2248–49. *Batson*'s progeny does not task the trial court with distinguishing between the jurors, but instead those cases require a trial court to acknowledge similarities among the stricken and non-stricken prospective jurors when they exist and determine whether the prosecution's reasons for striking a prospective juror are pretextual. *See Miller-El II*, 545 U.S. at 241 (focusing the Court's analysis on whether the "prosecutor's proffered reason for

striking a black panelist applies just as well to an otherwise-similar nonblack who is permitted to serve"); *see also Snyder*, 552 U.S. at 478–79 (conducting a comparative juror analysis); *Foster*, 578 U.S. at 505 (finding it "difficult to credit [the prosecutor's proffered reasons] because the State willingly accepted white jurors with the same traits that supposedly rendered [a Black juror] an unattractive juror").

In *Miller-El II*, the Supreme Court noted that "[t]he fact that [the State's] reason [for striking a Black prospective juror] also applied to . . . other panel members, most of them white, none of them struck, is evidence of pretext." 545 U.S. at 248. The use of trait-by-trait juror comparison was reaffirmed most recently in *Flowers*, where the Court explained that "[t]he comparison can suggest that the prosecutor's proffered explanations for striking black prospective jurors were a pretext for discrimination." *Flowers*, 139 S. Ct. at 2248. Importantly, on remand, the trial court was instructed to "compare . . . [the responses of the challenged juror] to any similarly situated white juror." *Hobbs I*, 374 N.C. at 360.

Accordingly, the trial court in Mr. Hobbs's case was required to compare the prospective jurors' responses and determine, based on their similarities, if the reasons given by the prosecution for striking Humphrey, Layden, and McNeill were pretextual. *Id.* By focusing on the differences between the jurors, the trial court foreclosed the possibility of any meaningful comparative juror analysis. *See Flowers*, 139 S. Ct. at 2248–49 ("When a prosecutor's proffered reason for striking a black panelist applies just as well to an otherwise-similar nonblack panelist who is

permitted to serve, that is evidence tending to prove purposeful discrimination." (cleaned up)). It will always be possible to find something different between two people, even identical twins. The trial court's "whole juror" analysis was not consistent with well-established legal principles.

## VI. Conclusion

"[T]he Equal Protection Clause forbids the prosecutor to challenge potential jurors solely on account of their race . . . ." *Batson*, 476 U.S. at 89. Ensuring that race is not the basis for a peremptory challenge "enforces the mandate of equal protection and furthers the ends of justice." *Id.* at 99.

As explained above, Mr. Hobbs's case is susceptible to racial discrimination because he is Black and four of his victims are white. The MSU study Mr. Hobbs presented is evidence of a culture of discrimination in Cumberland County from 1990 to 2010. The State's use of peremptory challenges in this case supports an inference of discrimination. And when a comparative juror analysis is properly conducted, it becomes clear that the State's race-neutral excuses for striking Humphrey, Layden, and McNeill are pretextual. Taking all this information together, I would conclude the State impermissibly used race to exclude Black prospective jurors and that the trial court committed several factual and legal errors in concluding otherwise. Accordingly, I dissent.

Justice MORGAN joins in this dissenting opinion.